**GULF OIL CORPORATION, Appellant,**

v.

**The STATE of Alaska, DEPARTMENT OF REVENUE, Appellee.**

No. S–1985.[*]

Supreme Court of Alaska.

March 25, 1988.

* Editor's Note: This opinion was originally published at 752 P.2d 983–999. It is published here as corrected.

Patrick Gilmore, Atkinson, Conway & Gagnon, Anchorage, Norman B. Barker, John H. Sharer, and Stephen L. Tolles, Gibson, Dunn & Crutcher, Los Angeles, Cal., for appellant.

David T. LeBlond, Asst. Atty. Gen., Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

William B. Rozell, Faulkner, Banfield, Doogan & Holmes, Juneau, Jerome R. Hellerstein, Herzfeld & Rubin, New York City, for amicus curiae Mobil Oil Corp.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

In this case, we must determine the proper state tax treatment of some extraordinarily high tax payments made by Gulf Oil Corporation to Kuwait, Iran, Nigeria, Ecuador, Venezuela, and Angola (hereafter the "KINEVA" countries)—payments that amounted to nearly all of Gulf's income in those countries. We must also determine the appropriate valuation of some Alaska oil drilling leaseholds that cost up to $12 million per year, but turned out to be nonproductive.

During the years in question, Alaska required companies that operated partly in-state and partly out-of-state to compute their Alaska taxable income by multiplying their worldwide net income by the fraction of that income allocable to Alaska. Worldwide net income is determined pre-tax—that is, without deductions for income taxes paid to other jurisdictions. AS 43.20.-031(c). In determining its worldwide net income on its 1975 to 1977 Alaska tax returns, Gulf deducted taxes it paid to the KINEVA countries. Gulf reasoned that the foreign taxes were not income taxes, since they were based on imputed revenues slightly higher than actual revenues. The first question of this case is whether those payments were income taxes within the meaning of the Alaska tax statutes. If so, they ordinarily would not be deductible in determining worldwide income.

Another question, on Gulf's 1972 through 1977 returns, involves the fraction of Gulf's worldwide income allocable to Alaska. One factor in determining that fraction is the proportion of Gulf's worldwide property located here. In that computation, property is ordinarily valued at cost.

AS 43.19.010, art. IV, ¶ 11. We must determine whether Gulf's non-producing Alaska oil leaseholds should be valued at cost or at zero. Valuing the leaseholds at zero would decrease the fraction of Gulf's worldwide income allocable to this state, and thus decrease Gulf's Alaska tax.

Beyond statutory interpretation, both of these questions involve fairness: The apportionment statute grants the Department of Revenue (DOR) discretion to alter the amount of income allocated to this state, to avoid an unfair result. AS 43.19.010, art. IV, ¶ 18. Also, the federal Constitution requires that state taxes be fairly apportioned to value earned in the state. Gulf claims that to deny a deduction for the foreign "income taxes," or to value the dry leaseholds at cost, would result in such a distortion as to violate the statutory and constitutional requirements of fairness.

## I.

### A. *Formula apportionment*

When a state seeks to tax a multi-state or multi-national business, it must determine the amount of income that is properly allocable to in-state activities. The traditional way of determining state income was through separate accounting by geographic area. In some contexts, though, this method has been criticized as too manipulable, and inadequately reflective of subtle but important contributions to income not resulting from formal ledger transactions.[1] *See Container Corp. v. Franchise Tax Bd.,* 463 U.S. 159, 164–65, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545, 553 (1983); *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 438, 100 S.Ct. 1223, 1232, 63 L.Ed.2d 510, 521 (1980).

Consequently, most states that imposed a corporate income tax began to use the formula apportionment method to determine state income. Under this approach, state income is determined by multiplying a company's worldwide income[2] by the fraction of that income attributable to in-state activities. The fraction is determined by a formula, using objective determinants of in-state activity.[3]

In 1959, Alaska substantially adopted the Uniform Division of Income for Tax Purposes Act (UDITPA), which contains a three-factor apportionment formula. Ch. 175, § 1, SLA 1959; *see* AS 43.20.130 (repealed 1975). Then, in 1970, Alaska adopted the Multistate Tax Compact, containing an apportionment formula virtually identical to the one in the UDITPA. Ch. 124, SLA 1970. *See* AS 43.19.010, art. IV, ¶¶ 9–18.[4] The Supreme Court considers

1. For example, the contribution to income resulting from centralization of management is difficult to account for under the transactional approach. *See Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 438, 100 S.Ct. 1223, 1232, 63 L.Ed.2d 510, 521 (1980).

2. Before the formula apportionment method can be used, it must be determined which components of a corporate family constitute a "unitary business." *See F.W. Woolworth Co. v. Taxation & Revenue Dep't,* 458 U.S. 354, 102 S.Ct. 3728, 73 L.Ed.2d 819 (1982); *Earth Resources Co. v. State, Dep't of Revenue,* 665 P.2d 960 (Alaska 1983). Here, Gulf and its subsidiaries have stipulated as to their unitary nature.

3. Examples of such objective determinants include the proportion of a company's property, payroll, and sales located within the taxing state, Uniform Division of Income for Tax Purposes Act § 9, 7A U.L.A. 348 (1985); the proportion of a company's manufacturing costs incurred within the taxing state, Wis.Stat. § 71.07(2) (1969) (which also has sales and property components); and the proportion of an oil producer's gas and oil that was extracted in the taxing state, AS 43.20.072(f) (enacted in 1981) (which also has sales and property components). Even before Wisconsin adopted the first state corporate *income* tax in 1911, formula apportionment was widely used for *property* tax purposes, especially when a multistate company owned mobile property. *See, e.g., Pullman's Palace Car Co. v. Pennsylvania,* 141 U.S. 18, 11 S.Ct. 876, 35 L.Ed. 613 (1891) (in which the fraction of a railroad company's rolling stock that could be taxed by a state was determined by the proportion of the company's track located within the taxing state). *See also Ott v. Mississippi Valley Barge Line Co.,* 336 U.S. 169, 171, 69 S.Ct. 432, 433, 93 L.Ed. 585, 588 (1949) (involving an ad valorem tax based on the percentage of an inland water route that was located within the taxing state).

4. Twenty-five states have adopted the UDITPA. 7A U.L.A. 331 (1985). There are twenty-eight states, including most of the same states that adopted the UDITPA, that are parties or associate members of the Multistate Tax Compact. All States Tax Guide (P–H) ¶ 565 (Oct. 27, 1987). Of the remaining states that tax corporate in-

this three-factor formula "a benchmark against which other apportionment formulas are judged." *Container Corp.*, 463 U.S. at 170, 103 S.Ct. at 2943, 77 L.Ed.2d at 556.

The first step in calculating an enterprise's Alaska income pursuant to the UDITPA formula is to determine its worldwide income. Since 1975, the Alaska statutes have provided that "[i]n computing the tax under this chapter, the taxpayer is not entitled to deduct any taxes based on or measured by net income." AS 43.20.031(c).[5] In other words, worldwide income in the Alaska formula is pre-tax income.[6] If Alaska allowed deductions for income taxes already paid to other states or countries, the worldwide income figure would be lower, thereby creating the possibility that Alaska would collect less tax than another jurisdiction simply by taxing later in time.

The next step in calculating the Alaska income of an enterprise is to determine the proportion of the company's business done in Alaska. To arrive at this fraction, the UDITPA formula relies on three indicators of business activity—property, payroll, and sales. The fraction of worldwide income attributable to Alaska is computed by averaging the proportion of the taxpayer's *property* that is located in-state, the proportion of the taxpayer's *payroll* that is paid in-state, and the proportion of the taxpayer's *sales* that occur in-state. AS 43.-19.010, art. IV, ¶¶ 9–17.

$$\text{Alaska taxable income} = \text{Worldwide income} \times \dfrac{\dfrac{\text{In-state property}}{\text{Total property}} + \dfrac{\text{In-state payroll}}{\text{Total payroll}} + \dfrac{\text{In-state sales}}{\text{Total sales}}}{3}$$

The UDITPA formula provided a practical and generally fair approach to calculating the proportion of worldwide income earned in-state. As with any formula, however, it did not always perfectly ascribe the correct amount of income to Alaska.[7, 8] For this reason, when the three-factor UDITPA formula produced unfair results, the apportionment statute gave the tax administrator discretion to use other reasonable methods to calculate in-state income. AS 43.19.010, art. IV, ¶ 18.

### B. *The KINEVA taxes*

During the years in question, Gulf's foreign oil production occurred primarily in

---

come, almost all use similar three-factor formulas for most business enterprises. *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 283, 98 S.Ct. 2340, 2349, 57 L.Ed.2d 197, 211 (1978) (Powell, J., dissenting). *But see Atlantic Richfield Co. v. State, Dep't of Revenue*, 705 P.2d 418, 426 n. 25 (Alaska 1985) (indicating that oil producing states tend to tax oil production differently).

**5.** "[T]his chapter" as referred to in AS 43.20.-031(c) is the Alaska Net Income Tax Act, AS 43.20. It incorporates the Multistate Tax Compact of Chapter 19: "A taxpayer ... shall allocate and apportion net income as provided in the Multistate Tax Compact (AS 43.19)." AS 43.20.065.

**6.** It is only for the 1975–77 tax years that Gulf contests the DOR's treatment of the KINEVA taxes. Prior to 1975, foreign income taxes were deductible. *See* Ch. 125, § 4, SLA 1976. Alaska, Montana, and North Dakota may be the only states that do not allow a deduction for foreign income taxes. *See* Mont.Code Ann.

§ 15–31–114(5)(a)(iv) (1987); N.D.Cent.Code § 57–38–01.3(1)(d) (1983).

**7.** The UDITPA formula only takes into account property, payroll, and sales. These, of course, are not the only factors relevant to income. *Container Corp.*, 463 U.S. at 184 n. 20, 103 S.Ct. at 2950 n. 20, 77 L.Ed.2d at 565. Also, assigning these factors equal weight is simplistic. *Id.* Furthermore, investment in property or wages in different countries may result in different rates of return. *Id.* For example, a dollar spent on wages in Alaska may result in less taxable income to Gulf than a dollar spent on wages in Angola, where wage rates are lower.

**8.** In fact, in 1978 (the year after the tax years at issue here), the Alaska legislature adopted separate geographical accounting as the method for determining oil producers' taxable income. Ch. 110, § 3, SLA 1978 (codified at AS 43.21 (repealed in 1981)). However, most other taxpayers were still required to use formula apportionment. In 1981, the State returned to an apportionment formula for determining oil compa-

the KINEVA countries. Except for Angola, the KINEVA countries are members of the Organization of Petroleum Exporting Countries (OPEC).

Because of their control over a major portion of the world's oil supply, the governments of the OPEC countries were able to take a very large share of the revenues from oil produced in their countries.[9] An expert hired by Gulf claims that those governments adjusted their take to the point that producers would just barely continue to produce. To this end, the governments imposed three different kinds of charges: (1) royalties, assessed at either a flat amount per barrel or a percentage of the value; (2) participation charges, which were costs incurred when producers were compelled to purchase government-claimed shares of oil at higher-than-market prices; and (3) income taxes. The income taxes were based on the gross value of oil, determined by government-posted prices, minus expenses.

The DOR does not dispute that the royalties and participation payments are deductible costs of doing business. At issue is whether the income taxes are deductible.

The income taxes that the KINEVA countries levied on oil producers were extraordinarily high. For example, in 1977, the income tax Gulf paid to the KINEVA countries was over $1 billion. Gulf claims its after-tax income from the KINEVA countries was $13 million.[10] If so, the effective tax rate was almost 99% in 1977. Gulf claims the effective tax rate in 1976 was over 100%; that is, Gulf paid more in

income taxes to the KINEVA countries than it earned in those countries.

Gulf asserts that the KINEVA taxes are not based on true income, but on imputed income, derived from government-posted prices of oil that were slightly different from the actual market price. Gulf argues that the KINEVA taxes therefore are not true "income" taxes, as the term is used in the Alaska tax statute.

### C. *The dry leaseholds*

During the years 1972 through 1977, Gulf held a 50% and a 90% interest in two partnerships that leased oil and gas drilling rights in the Colville delta area on the North Slope of Alaska, just west of Prudhoe Bay. The partnerships acquired most of these leases in competitive bidding in 1969. The DOR valued the leaseholds at $33 million to $94 million, depending on the year.[11] The property was valued at cost, pursuant to AS 43.19.010, art. IV, ¶ 11.[12]

In 1972, one well was drilled on the properties. Apparently, the well was unproductive. Consequently, the leaseholders relinquished four of the six leases in December of 1973, and allowed the remaining two leases to expire on September 30, 1979. Until they expired, Gulf conducted seismographic research on the remaining two leaseholds to better understand how to avoid similar bad investments in the future.

Gulf did little other business in Alaska. In each of the years in question, the value of Gulf's property other than the dry leaseholds was small in comparison, ranging from a low of approximately $80,000 in 1974, to a high of slightly over $1 million in

nies' taxable income, albeit a different formula. AS 43.20.072.

9. Although Angola (one of the KINEVA countries) was not a member of OPEC, it apparently followed OPEC pricing policies.

10. To calculate this figure, we presume Gulf used formula apportionment to derive the amount of its worldwide income allocable to the KINEVA countries. However, in *Atlantic Richfield Co. v. State, Dep't of Revenue*, 705 P.2d 418, 426 (Alaska 1985), we acknowledged that formula apportionment can seriously understate an oil producer's income. If Gulf's "true" KINEVA income is much higher, then its after-tax

KINEVA income would likewise be much higher.

11. The figures supplied by the DOR refer to all of Gulf's Alaska property, not just its dry leaseholds. However, Gulf claims it had little or no other property.

12. The State evidently charged an annual rent, as well as a separate upfront payment at the outset of the lease. For purposes of the apportionment formula, the DOR values such a lease at the amount of the advance payment, plus eight times the annual rent. *In re La. Land and Exploration Co.*, No. 79-38 at 32 (Alaska Dep't of

1977. In four of the six years in question, Gulf's sales in Alaska were zero. In some years Gulf had no employees in Alaska, while in other years Gulf had only a handful. Gulf did not extract any oil or gas in Alaska. Gulf argues that based on these facts, the non-producing leaseholds must be valued at zero.[13]

## D. *Proceedings*

Gulf filed timely tax returns for the years 1972 through 1977. Gulf paid Alaska income taxes ranging from a low of $47 (including interest) in 1975 to a high of $1,878 in 1974.[14]

The DOR audited the returns. It disallowed Gulf's deductions of the KINEVA income taxes, and included the cost of the non-producing leaseholds in the property component of the apportionment formula. The DOR issued deficiency assessments of about $940,000 plus interest.

Gulf requested and received a hearing to review the deficiency assessments. In March of 1984, the hearing examiner decided in favor of the State. Gulf appealed to the superior court.

The superior court affirmed that the nonproductive leaseholds should be valued at cost in the property component of the apportionment formula. As for the KINEVA taxes, the DOR softened its policy after briefs had been filed but before oral argument in the superior court. Originally, the DOR characterized the entire tax as an income tax, which was non-deductible. However, the KINEVA taxes were based on *imputed* revenues minus costs rather than on *actual* revenues minus costs. The imputed revenues were determined by government-posted prices of oil, which typi-

cally were slightly higher than the actual market prices. The DOR's new position was that it would view the tax as having two components: an income tax (the larger component) and a non-income tax.[15] The non-income tax portion, which was the amount of tax based on the excess of the imputed revenues over actual revenues, would be deductible,[16] while the pure income tax portion would not. Thus, at oral argument, the DOR offered to reduce Gulf's deficiency. Accordingly, the superior court remanded to the DOR for the downward adjustment. The adjustment reduced Gulf's assessed deficiency by about $19,000.

The superior court held a second hearing in December of 1986. There, Gulf argued that (1) the KINEVA taxes were not income taxes, and could not be saved by excising off the bad portion; and (2) even after the adjustments, inclusion of those taxes in Gulf's income would be grossly unfair, in violation of the discretion clause of the state tax statutes,[17] and of the due process requirements of the state and federal constitutions. The superior court affirmed the administrative decision, finding that Gulf failed to prove unfair taxation.

Gulf now appeals.[18]

## II.

We will first address whether the amounts Gulf paid as income tax to the KINEVA countries should be included in Gulf's pre-tax worldwide income.

### A. *Statutory interpretation*

In Alaska, the proper tax treatment of payments made to foreign governments is determined in part by whether the pay-

---

Revenue, Aug. 29, 1979). For convenience, we refer to this method as "cost" valuation. The term is to be contrasted with "market" valuation.

13. If the leases were valued at zero, the fraction of Gulf's worldwide income attributable to Alaska would range from .000002 to .000063, depending on the year. If valued at cost, the fraction would range from .0005 to .0018.

14. Somewhat different figures are given at different places in the record.

15. At oral argument, the attorney for the State emphasized that the DOR did not concede that the original tax, unadjusted, was not an income tax.

16. The State's change of policy was influenced by a decision of the California State Board of Equalization, entitled *Appeal of Occidental Petroleum Corp.* (June 21, 1983).

17. AS 43.19.010, art. IV, ¶ 18.

18. Mobil Oil Corp., an amicus curiae in this case, has similar litigation pending.

ments are *income* taxes. AS 43.20.031(c) states: "[T]he taxpayer is not entitled to deduct any taxes based on or measured by net income." The question addressed in this section is whether the KINEVA taxes are "based on or measured by net income." [19]

In the administrative decision, the hearing examiner stated that "the KINEVA country taxes are described as taxes based on an income which has been computed as the excess of gross income or gross value over expenses. The gross value is based on the posted price [of oil] rather than the actual sales price." Gulf claims that since the posted price exceeded the actual price, the taxes were not based on income.[20]

The hearing examiner concluded that taxes can be income taxes even if based on imputed revenues rather than actual revenues, so long as expenses can be deducted. The decision implies that the true hallmark of an income tax is deductibility of expenses; the fact that a tax may not be based on true revenues is of somewhat lesser importance.

■ We need not review that holding. The administrative decision was made a year before the DOR offered to split the KINEVA taxes into two components: an income tax and a non-income tax. Since the DOR has now allowed a deduction for the non-income tax, only the remaining portion of the KINEVA taxes—the portion based on actual revenues—is still under dispute. We conclude that the remaining portion lies squarely within the common-sense notion of a tax "based on or measured by net income." First, it is based on actual revenues. Second, expenses are de-

ductible. Thus, we do not reach which of these two characteristics is the more important hallmark of an income tax.

We must still address whether the DOR had authority to treat the KINEVA taxes as if they had income and non-income components. Gulf argues that a tax must be characterized in its entirety: it is either based on income, or not based on income. If it is based even slightly on something other than income, it should be totally deductible.

■ Gulf's position is untenable. While governmental levies in our country are typically compartmentalized into income taxes, property taxes, sales taxes, royalties, etc., other governments do not necessarily adopt the same approach. Alaska has no control over whether the KINEVA countries impose a tax based partly on net income and partly not. If a foreign government does impose such a tax, it is necessary to dissect it to determine what portion should be deductible under Alaska law. This is consistent with the text of AS 43.20.031(c), which states: "the taxpayer is not entitled to deduct any taxes based on or measured by net income." We interpret that clause as giving authority to the DOR to determine what portion of a tax is based on or measured by net income.

We do not imply that the DOR has authority to stretch or cut *any* tax so that one portion of it appears to be an income tax. However, in this case the KINEVA taxes were either income taxes or very close to income taxes even before the DOR adjustments. The taxes were based on imputed revenues that were typically somewhat higher than actual revenues. The

---

19. Two standards of review apply. First, the question of what the statute means when it says "based on or measured by net income" is a question of law. Since the answer depends on "the particularized experience and knowledge of the administrative personnel," the reasonable basis test is the appropriate standard of review. *Kelly v. Zamarello*, 486 P.2d 906, 916 (Alaska 1971). Second, whether the KINEVA taxes fit that definition is a question of fact, which we review under the substantial evidence test. *See Galt v. Stanton*, 591 P.2d 960, 963 n. 11 (Alaska 1979) (citing *Keiner v. City of Anchorage*, 378 P.2d 406, 411 (Alaska 1963)).

20. In the nearly 2000 pages of record and briefs in this case, Gulf refers to only the scantiest evidence of the makeup of the KINEVA taxes. There is not a single translation or even paraphrase of the relevant foreign tax codes. The only evidence of the nature of those taxes was given in just a few sentences by Professor Robert Stobaugh, Gulf's expert, in the administrative hearing. At oral argument in this court, however, the State's attorney pointed out that all production costs, royalties, participation charges, and depletion charges were deductible in computing the KINEVA taxes.

portion of the tax that was not based on income, for which the DOR has now allowed a deduction, amounted to about $323 million for the three years in question. That is only 8.4% of Gulf's total KINEVA "income tax" payments, which amounted to $3.86 billion for those three years. The fact that 8.4% of the tax Gulf paid was not based on income does not make the entire payment deductible.

We conclude that the taxes as adjusted are based on income, and that the statute allows the DOR to make such adjustments when a tax cannot be characterized entirely as an income tax.

B. *Section 901 regulations*

Gulf and amicus curiae Mobil argue that certain federal treasury regulations which pertain to section 901 of the Internal Revenue Code define what is meant by a foreign income tax, and that Alaska has adopted those regulations by reference. Further, they argue that under those regulations, the KINEVA taxes are not income taxes.

Alaska Statute 43.20.021 (footnote added) provides:

> INTERNAL REVENUE CODE ADOPTED BY REFERENCE.
>
> (a) Subtitle F and chapter 1 of subtitle A of the 1954 Internal Revenue Code, Public Law 83-591, as amended,[21] are adopted by reference as a part of [AS 43.20] ... These portions of the Internal Revenue Code have full force and effect under [AS 43.20] unless excepted to or modified by other provisions of [AS 43.-20].

Administration of the tax law is governed by AS 43.20.160, which provides in part:

> (c) ... The department shall apply as far as practicable the administrative and judicial interpretations of the federal income tax law.

Finally, AS 43.20.300 determines the effect of references to the Internal Revenue Code:

> REFERENCES TO INTERNAL REVENUE CODE.

> (a) The provisions of the Internal Revenue Code as now in effect or hereafter amended mentioned in this chapter are incorporated in this chapter by reference and have effect as though fully set out in this chapter.
>
> (b) When portions of the Internal Revenue Code incorporated by reference as provided in (a) of this section refer to rules and regulations adopted by the United States Commissioner of Internal Revenue, or hereafter adopted, they are regarded as regulations adopted by the department under and in accord with the provisions of this chapter, unless and until the department adopts specific regulations in place of them conformable with this chapter.

This court has recognized the desirability of conforming state tax law to federal interpretations. *Wien Air Alaska, Inc. v. Department of Revenue*, 647 P.2d 1087, 1095 (Alaska 1982). Nevertheless, the section 901 regulations are irrelevant to this dispute.

Under section 901, a federal taxpayer may elect to take a credit for foreign income taxes paid. I.R.C. § 901. Thus, subject to certain limitations, the U.S. Treasury will reimburse the taxpayer for those foreign taxes. If the taxpayer does not elect to take the credit, the foreign taxes are nevertheless deductible. I.R.C. § 164; *see also* I.R.C. § 275. Certain taxpayers may find the deduction more advantageous because of limitations on the credit. *See* I.R.C. § 904.

Taxpayers that deduct their foreign tax payments are indifferent to whether those payments are called "income taxes," "royalties," "charges," or anything else because, regardless of the label, the payments are deductible. On the other hand, taxpayers that prefer to credit their foreign taxes care very much about whether those levies can properly be characterized as "income taxes," because only income taxes can be credited.

Consequently, all federal taxpayers that challenge whether a foreign levy is an in-

---

**21.** Chapter 1 of subtitle A includes I.R.C. § 901.

come tax have exactly the same incentive: they want the levy to be an income tax. In response to this incentive, the Treasury Department adopted regulations designed to make it difficult for a levy to pass muster as an "income tax." *See* Treas.Reg. § 1.901–2, 1.901–2A (1983). The regulations accomplish this by starting with the presumption that a levy is not an income tax, and placing the burden on the taxpayer to prove whether any portion of the levy should be regarded as an income tax.[22]

These regulations are inapplicable to the question of whether the KINEVA taxes are income taxes for purposes of state apportionment. In Alaska, foreign income taxes are neither deductible, AS 43.20.-031(c), nor creditable, AS 43.20.036(a). Other types of governmental levies are deductible. Therefore, the taxpayer has the incentive to establish that no portion of a foreign levy is an income tax. This is precisely opposite from the incentive under the federal tax scheme. Thus, it would be incongruous to apply the federal regulations in this instance, since the regulations start with the presumption that a levy is not an income tax, and require the taxpayer to prove otherwise. If these regulations applied to state taxation, they would promote tax avoidance, rather than prevent it.

The oil companies' argument that Alaska law compels the DOR to follow these federal regulations is contrary to sound policy. Moreover, even on technical grounds, the argument fails. Alaska Statute 43.20.-021(a) incorporates chapter 1 of subtitle A of the Internal Revenue Code, *"unless excepted to or modified by* other provisions of [AS 43.20]" (emphasis added). We find that the portion of the Internal Revenue Code dealing with the foreign tax credit—sections 901 through 908—is "excepted to or modified by" AS 43.20, which allows neither a deduction nor a credit for foreign income taxes. That is not to say that Alaska law incorporates no Code provisions and no federal regulations having to do with the foreign tax credit. Future cases may reveal that it is desirable to conform our law to certain aspects of those federal provisions. However, regulations that presume that a foreign levy is not an income tax until the taxpayer proves otherwise are contrary to Alaska tax policy.

## C. *Fairness*

We have held that the KINEVA taxes, as adjusted by the DOR, are "based on or measured by net income." Thus, AS 43.-20.031(c) provides that they may not be deducted in computing Gulf's worldwide pre-tax income in the apportionment formula. However, the UDITPA formula sometimes produces unfair results. For that reason, the apportionment statute contains a clause giving the DOR discretion to use another method:

If the allocation and apportionment provisions of this Article do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the tax administrator may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

(a) separate accounting;

(b) the exclusion of any [sic] or more of the factors;

(c) the inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

(d) the employment of any other method to effectuate an equitable allocation

---

**22.** A taxpayer that receives an economic benefit as a result of paying the levy is considered a "dual capacity taxpayer." Treas.Reg. § 1.901–2(a)(2)(ii) (1983). The levy is considered to have two elements: a *deductible* amount paid in exchange for the benefit, and a *creditable* amount paid as income tax. The regulations require the taxpayer "to establish the amount, if any, that is paid pursuant to the distinct element of the levy that is a tax.... If such person fails to so establish such amount, no portion of the amount that is paid ... shall be treated as an amount of tax." Treas.Reg. § 1.901–2A(b)(1) (1983). Treas.Reg. § 1.901–2A(a)(ii), which states that "a tax either is or is not an income tax, in its entirety, for all persons subject to the tax," does not appear to block the determination of what portion of a foreign levy should be considered an income tax for dual-capacity taxpayers, in Treas.Reg. § 1.901–2A(b)(1).

and apportionment of the taxpayer's income.

AS 43.19.010, Art. IV, ¶ 18 (hereafter the "discretion clause").

■ The question addressed in this section is whether inclusion of the amount of Gulf's KINEVA income tax payments in its worldwide pre-tax income results in an unfair representation of Gulf's Alaska activity. The administrative decision held that inclusion of the KINEVA taxes is not unfair. The superior court agreed.[23]

Inherent in the use of formula apportionment is the legislative decision that a certain degree of distortion will be tolerated. The question in this case is whether the result is unfair to a degree that exceeds those tolerable limits.

Formula apportionment does not require uniform tax rates among all taxing jurisdictions. Formula apportionment is a method for determining how a company's income should be allocated, so that a state can tax no more than its share.[24] Once the income is fairly allocated, each jurisdiction can tax its share at whatever rate it chooses.

For example, suppose a company does equal amounts of business in each of two jurisdictions—A and B. The company's total income is $200. Perfect formula apportionment would attribute $100 of income to each of A and B. Apportionment plays no further role; each jurisdiction can tax the $100 as it pleases. Suppose Jurisdiction A taxes at 10%, resulting in a tax of $10. It is entitled to do so regardless of whether Jurisdiction B taxes at 0%, 100%, or any rate in between.[25] While a 100% rate may be highly objectionable, it is none of jurisdiction A's business.

The facts of this case seem remarkably similar to the example just given. If so, while the magnitude and rate of the KINEVA taxes may be high, they are irrelevant in this case.

However, Gulf alleges there is a difference. In the example above, the company's income in each jurisdiction remains constant at $100, regardless of the tax rate in Jurisdiction B. High rates in Jurisdiction B do not affect the tax collected by Jurisdiction A, which remains at a steady $10. However, in the case now before us, there is evidence that the OPEC countries are such major suppliers of the world's oil that the amount of taxes they assess determines, in part, the world price of oil. To the extent that this is true, every increase in OPEC (and KINEVA) taxes causes a corresponding increase in the price of oil, thereby increasing Gulf's worldwide pre-tax income. In short, the amount of tax Alaska collects may not be constant and independent of the KINEVA tax rate. Instead, an increase in KINEVA taxes may result in a higher price of oil, a higher worldwide pre-tax income, and therefore a higher Alaska tax.[26]

Nevertheless, we do not believe that this relationship between the KINEVA tax rate and Gulf's Alaska income, to the extent it may exist, causes an unfair representation of Gulf's Alaska activities to a degree that would require the apportionment formula to be modified or abandoned. The prices of oil produced in different places around the world remain roughly in parity: if the price goes up in the mideast, the price goes up in Alaska. For this reason, while tax increas-

23. Since the discretion clause allows, but does not require, the DOR to grant relief, we review the DOR's decision using the "arbitrary, unreasonable, or ... abuse of discretion" standard. *See Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 161 (Alaska 1982).

24. One of the measures of fairness of an apportionment formula is whether it is internally consistent. A formula is internally consistent when, if used by every jurisdiction, it could not result in multiple taxation of the same value. The formula must allocate every dollar of income to no more than one jurisdiction. *Container Corp.,* 463 U.S. at 169, 103 S.Ct. at 2942,

77 L.Ed.2d at 556. Each jurisdiction may then determine the rate at which it will tax income allocated to it. This is very different from the notion that each sovereign must tax at the same rate.

25. *We do not express an opinion on whether the result would be any different if Jurisdiction B were to tax at a rate higher than 100%—for example, at 200%.*

26. To some degree, all taxes affect market prices. However, the relationship here may be far more pronounced than usual.

es in the KINEVA countries may cause Gulf's Alaska tax to rise, they also cause Gulf's Alaska activity to rise. The activity rises in the sense that investments have the potential to produce greater profits. Gulf's major activity in Alaska during the years in question was the ownership of leases. As the price of oil went up, the value of the leases presumably went up.[27] Thus, it is appropriate, rather than unfair, that an increase in KINEVA taxes and an increase in world oil prices should increase Gulf's Alaska taxable income.

Even though the KINEVA taxes (net of the adjustment made by the DOR) may be cast in the form of an "income" tax as the term is used in AS 43.20.031(c), they could still represent, at least in part, a charge for the privilege of doing business. To that extent, they should be deductible. The problem is to determine what portion, if any, should be deductible. The distinction between an income tax and a cost of doing business is not a clear one, even in theory. The KINEVA countries did not itemize their levy into two entries, one for "real" income tax, and the other representing a charge disguised as an income tax. Yet, it is within our power to make such a division, or to order the DOR to make it.

Gulf's attorneys have proposed three alternative methods for measuring worldwide income. As discussed below, we find each of those methods flawed.

Gulf's first proposal for measuring worldwide income is the Comparable U.S. Tax Method.[28] Under this approach, Gulf's pre-tax income in the KINEVA countries is deemed to be the amount which, at U.S. tax rates, would have yielded the after-tax income that Gulf actually realized in those countries. For example, in 1977, Gulf claims its after-tax income in the KINEVA countries totalled $13 million.[29] The applicable U.S. tax rate was 48%. Before realizing $13 million in *after*-tax income, a comparable U.S. taxpayer would have had a *pre*-tax income of $25 million, and would have paid $12 million (48% of $25 million) in taxes. Thus, $25 million should be deemed to be the "corrected" pre-tax KINEVA income. That is, of the $1.068 billion in income taxes that Gulf paid to these countries in 1977, $12 million were "true" income taxes; the remainder was some other kind of government levy, which should be deductible.

The problem with this approach is the arbitrary choice of 48% as the appropriate tax rate for the KINEVA countries. As already discussed, the validity of formula apportionment does not depend on whether each jurisdiction taxes at the same rate. There is little reason why the 48% rate is more fair than the 99% rate which the KINEVA taxes apparently amounted to in 1977. Alaska has no obligation to treat foreign taxes as if they were at U.S. rates. While the results of the proposed calculation would result in less tax to Gulf, Gulf has not shown that the tax would be more fair.

The second method proposed by Gulf is the Non–Oil Company Method.[30] Under this approach, Gulf's pre-tax KINEVA income is deemed to be the amount which, at the tax rate for *non*-oil companies in those

---

27. This is true even when the tracts turned out to be non-productive. Their value lies in the information they convey that reduces the likelihood of similar bidding errors in the future. *See infra* Section III. Since the bidding price of leases depends on the price of oil, so does the cost of mistakes, and therefore so does the dollar value of information that reduces the likelihood of mistakes.

28. Gulf called this method the "Distortion Method." We use a less pejorative label.

29. *See supra* note 10.

30. As proposed by Gulf, it is called the "IRS Regulation Method." This method is prescribed as a safe harbor in Treas.Reg. § 1.901–2A(e)(1)

(1983). Its purpose is to determine how much of a composite foreign levy is an "income tax," when the taxpayer seeks to get a credit for the income tax portion. As discussed *supra* page 21, the § 1.901–2 and –2A regulations are designed to counteract the federal taxpayer's incentive to characterize as much of a foreign levy as possible as an "income tax." The regulations, including the safe harbor method, make it difficult for a taxpayer to successfully characterize very much of a levy as an income tax.

As explained earlier, the regulations are not incorporated into Alaska law. Nevertheless, we evaluate the Non–Oil Company Method on its merits, just like the other proposals.

countries, would have yielded the after-tax income that Gulf actually realized in those countries.

We find that this method is as arbitrary as the Comparable U.S. Tax Method. There is no reason why it is unfair for a foreign sovereign to tax oil companies at a different rate from general taxpayers.[31] Nor do we see any reason why fairness requires the DOR to treat different tax rates as if they were the same.

The third method proposed by Gulf does not appear to be a viable method for determining taxation at all. According to Gulf, this method "computes the proper amount of KINEVA income taxes by determining the amount of tax that would be payable to the KINEVA countries if those countries followed the Alaska three-factor formula apportionment method." However, apportionment does not determine tax; it determines what portion of worldwide income should be attributed to a particular geographic area. Once the income is apportioned, any tax rate can be imposed. Yet, Gulf computed the taxes payable under this theory, without explaining in its brief what tax rate it used or why.

In short, each of the methods proposed by Gulf would result in a lower tax. However, we do not equate "lower" with "more fair." Each method is at least as arbitrary as the DOR's strict application of AS 43.-20.031(c). We find Gulf did not carry its burden of establishing that its proposed methods are more fair than the legislature's clearly-expressed preference that "the taxpayer is not entitled to deduct any taxes based on or measured by net income." AS 43.20.031(c).[32] The difficulty of devising defensible alternatives indicates the theoretical difficulty of correctly allocating income. This is the very reason the

legislature adopted formula apportionment, coupled with AS 43.20.031(c), as the norm. We find that it can be strictly applied here without correction, and support the DOR's decision not to grant relief.

### D. The constitutional dimension of non-deductibility of the KINEVA taxes

■ A state must confine its income tax to value earned within its borders. *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 164, 103 S.Ct. 2933, 2939, 77 L.Ed.2d 545, 552 (1983). To do otherwise would violate both the due process clause and the commerce clause of the federal constitution.[33] *Norfolk & W. Ry. Co. v. Missouri Tax Comm'n*, 390 U.S. 317, 325, 88 S.Ct. 995, 1001, 19 L.Ed.2d 1201, 1207 (1968). These constitutional requirements are satisfied "if the tax is fairly apportioned to the commerce carried on within the State." *Ott v. Mississippi Valley Barge Line Co.*, 336 U.S. 169, 174, 69 S.Ct. 432, 434, 93 L.Ed. 585, 589 (1949).

The Supreme Court long ago upheld the constitutionality of formula apportionment. *See, e.g., Underwood Typewriter Co. v. Chamberlain*, 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed. 165 (1920). As noted earlier, the objective approach to apportionment sometimes leads to inequities, because it fails to account for the peculiarities of individual businesses. Thus, the Court has occasionally invalidated a particular application of an apportionment formula. *See, e.g., Norfolk & W. Ry. Co.*, 390 U.S. at 317, 88 S.Ct. at 995, 19 L.Ed.2d at 1201. However, the Court has admitted that the proper allocation of income to any particular state is not only difficult to achieve, but difficult to describe even in theory. *Container Corp.*, 463 U.S. at 164, 182, 103 S.Ct. at 2949, 77 L.Ed.2d at 552, 564. For that reason, in

---

**31.** The United States treats oil companies differently under its taxing scheme. *See* I.R.C. §§ 4986–98.

**32.** This is a preference, rather than a mandate, because it can be mitigated by the discretion clause of AS 43.19.010, art. IV, ¶ 18.

**33.** Due process imposes two requirements: a minimal connection between the taxing state and the taxed corporation, and "a rational rela-

tionship between the income attributed to the State and the intrastate values of the enterprise." *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 436–37, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510, 520 (1980). The commerce clause imposes an additional requirement that the tax not discriminate against interstate or foreign commerce. *See Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326, 331 (1977).

this type of constitutional challenge the Court has placed a steep burden on the taxpayer to prove "by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportions to the business transacted ... in that State,' ... or has 'led to a grossly distorted result.'" *Id.* at 170, 103 S.Ct. at 2942, 77 L.Ed.2d at 556 (citations omitted).

■ Gulf claims that the challenged tax is so distorted that it violates the Constitution. For the reasons discussed in the preceding section, Gulf has not met its steep burden of proof. Gulf has raised the possibility that even though the KINEVA levies are cast in the form of income taxes, a portion might actually be a charge for doing business. While this possibility is real, no clear and cogent evidence shows whether, or to what extent, it actually occurred. We believe that the mere magnitude of the KINEVA tax burden is not dispositive. For these reasons, the DOR's failure to grant relief is not unconstitutional.

### III.

We now turn to whether Gulf's non-productive Alaska leaseholds should be valued at zero in determining what proportion of Gulf's worldwide property is in Alaska.

#### A. *Overview*

For each of the years at issue, 1972 through 1977, the DOR valued Gulf's leaseholds at cost in computing the property component of the apportionment formula. This was in accordance with the apportionment statute, which states:

> Property owned by the taxpayer is valued at its original cost. Property rented

by the taxpayer is valued at eight times the net annual rental rate.

AS 43.19.010, art. IV, ¶ 11.[34]

Gulf believes that the leaseholds should be valued at zero because they turned out to be dry. The leaseholds could be valued at zero pursuant to the discretion clause of the apportionment statute, which allows the DOR to exclude any factor in order to "fairly represent the extent of the taxpayer's business activity in this state." AS 43.19.010, art. IV, ¶ 18.[35] Therefore, the question boils down to whether the result is unfair, and again, it has statutory and constitutional dimensions.

#### B. *Fairness*

The March 1984 administrative decision found no unfair taxation, relying heavily on the then-recent case of *State, Department of Revenue v. Amoco Production Co.*, 676 P.2d 595 (Alaska 1984) which it found controlling. In July of 1985, the superior court affirmed from the bench. One month later, we handed down our decision in *Atlantic Richfield Co. v. State, Department of Revenue*, 705 P.2d 418 (Alaska 1985) (*Arco*). We address the question of whether *Arco* impliedly overruled *Amoco*.

##### 1. The *Amoco* decision

In *Amoco*, we were asked to decide whether Amoco's non-producing North Slope leaseholds should have been included in the property component of the apportionment formula. First, we interpreted the relevant statutory and regulatory language (which remained in effect during the period relevant to Gulf's dispute). The property was includable if it was "real [or] tangible personal property owned or rented and *used* in this state," AS 43.20.130 (repealed 1975) (emphasis added), which encompassed

---

**34.** *See supra* note 12.

**35.** Gulf originally made three arguments:
(1) the leaseholds were not "the taxpayer's real and tangible personal property," and therefore, according to AS 43.19.010, art. IV, ¶ 10, are not includable in the property component;
(2) since the leaseholds were dry, they were not "used" within the meaning of the statute; and
(3) if the leaseholds were included at cost, it would be unfair and result in gross distortion.

The hearing examiner held in favor of the State on all three issues. He relied on *State, Dep't of Revenue v. Amoco Prod. Co.*, 676 P.2d 595 (Alaska 1984), which was decided just two months earlier and which clearly resolved at least the first two issues. In this appeal, Gulf presses only its third argument—namely, that the result is unfair.

property that was "available for use, or . . . capable of being used for the production of business income." 15 AAC 10.120.[36]

We found that the dry leases were "used":

The non-producing oil and gas leases are an example of nonobvious contributions to Amoco's production of income. The exploration and development of what later turn out to be unproductive oil or gas wells is a necessary and integral part of Amoco's eventual discovery and exploration of productive oil and gas wells. To say that only property values associated with oil and gas leases which are known to contain recoverable quantities of oil and gas should be included within the property factor is to ignore the actual business activities that lead up to Amoco's ability to derive oil and gas income. . . . To interpret the word "used" contained in AS 43.20.130(b) to exclude such leaseholds is overly restrictive and not consonant with the realities of oil and gas production.

*Amoco*, 676 P.2d at 599–600 (citations and footnotes omitted).

We next addressed Amoco's claim that the resultant apportionment was so distorted that it violated Amoco's due process rights. *Id.* at 600. Most of the income attributed to this state resulted from inclusion of the dry leases in the property factor; Amoco's other in-state property, as well as its sales and payroll, were minor by comparison. *Id.* at 601. Nevertheless, we found that the court erred in focusing on the relative value of the dry leaseholds. The high cost of the leaseholds indicated only that oil exploration is expensive, not that there is any distortion in the formula. *Id.* We went on to say:

[T]hese figures reflect the recent acquisition by a multinational oil company of a large amount of land in a remote and unexplored area in the world, which held the potential of generating substantial income to the corporation. Although perhaps with hindsight the lease acquisitions may not have been profitable, there can be no doubt that in the past they were viewed as a preliminary step in the generation of income.

*Id.* (footnote omitted). We held that Amoco failed to establish a gross distortion. *Id.*

2. The 1978 Oil Tax and the *Arco* decision

Our *Amoco* opinion would seem to control in this case. However, we will briefly examine whether subsequent developments cut back on our decision in *Amoco*.

First, effective in 1978, the legislature changed the method for taxing oil producers. Ch. 110, §§ 1–2, SLA 1978. Under the new law (the "Oil Tax"), oil production income was no longer subject to formula apportionment. Instead, such income was determined by separate accounting, without regard to the taxpayer's business elsewhere. AS 43.21 (repealed in 1981). Net production income was the fair market value of extracted oil at the wellhead, less the costs of various activities such as exploration, lease acquisition, and extraction. AS 43.21.020(b)-(c) (repealed in 1981).

In enacting the Oil Tax, the legislature explicitly found and declared that the statutory apportionment formula "does not fairly represent the extent of the business activities in this state of multistate corporations engaged in the production . . . of crude oil and natural gas in Alaska." Ch. 110, § 1, SLA 1978.[37] This legislative find-

---

**36.** Amoco's dispute involved the tax years 1971 through 1974. *Amoco*, 676 P.2d at 596. AS 43.20.130 was repealed by ch. 70, § 13, SLA 1975. However, the quoted portion remained in AS 43.19.010, art. IV, ¶ 10, applicable to oil companies through 1977. The quoted regulation, 15 AAC 10.120, was also in effect through 1977.

**37.** The legislature did not intend the Oil Tax to abrogate the Multistate Tax Compact. Rather, it

intended the Oil Tax to be "in accordance with the provisions of art. IV, sec. 18 [the discretion clause] of the Multistate Tax Compact (AS 43.-19)." Ch. 110, § 1, SLA 1978. The words used by the legislature in its findings—"does not fairly represent the extent of the business activities in this state"—are essentially identical to the words that trigger the operation of the discretion clause of the Multistate Tax Compact. *Id.;* AS 43.19.010, art. IV, ¶ 18.

ing appears to bear heavily on whether Gulf's in-state taxable income is fairly represented by the apportionment formula. That is not to say that a 1978 legislative finding is binding on us in this litigation: First, this litigation concerns facts as they existed from 1972 to 1977, and not in 1978. Second, the proper body to interpret the meaning of a 1970 act (the Multistate Tax Compact) is the court and not a subsequent legislature. Nevertheless, while not dispositive, we give the legislative findings considerable respect in our analysis.

The legislature did not explain the exact manner in which formula apportionment unfairly represents the oil companies' income.[38] But we did, in *Arco*, 705 P.2d 418, 425–26 (Alaska 1985).[39] In that case, Arco challenged the Oil Tax, arguing that formula apportionment was constitutionally required. We disagreed. In the process, we examined shortcomings of Alaska's apportionment formula as applied to oil companies. We observed that the formula seriously understates the typical oil producer's income for several reasons. First, the property component is skewed, in that "the major income-producing element is the value of the oil and gas reserves in the ground ... [which] is not recognized under traditional formula apportionment methods." *Id.* at 426.[40] Second, the payroll component is skewed, since "much of the production work is done by employees based in other states, or by independent contractors...." *Id.* Finally, the sales component is skewed, since only a "tiny fraction" of Alaska oil is sold in-state. *Id.*

The first of these three observations— namely, to list a very valuable oil reserve at cost tends to deflate the owner's in-state

activities—is especially relevant here. If it is similarly unfair to list a dry oil leasehold at cost, then our reasoning in *Arco* would cut back on, if not overrule, *Amoco*.

### 3. *Amoco* is still good law

■ We now conclude that the reasoning of *Arco* does not restrict the application of *Amoco* to this case. First, the apportionment scheme we analyzed in *Amoco* must be viewed in its entirety. Prior to 1978, property was treated at cost, whether it had depreciated or appreciated. This can be seen as a deliberate legislative decision to sacrifice a certain degree of fairness, in favor of administrability.[41] In this light, we believe that the discretion clause has to be read so as to apply only to very unusual cases. However, there is nothing unusual about business property that was purchased as a gamble and subsequently did not pay off. All business property is purchased as a gamble. Presumably, Gulf took the uncertainty into account in the price it was willing to pay for the leases. The mere fact that the gamble did not pay off does not mean that apportionment based on cost is unfair. To allow Gulf a tax break for a lost gamble would be anomalous, since Gulf would not have paid any additional tax had it won the bet.

Furthermore, in *Arco* we found distortion in each of the three components of the apportionment formula: property, payroll, and sales. The cumulative effect of the distortions amounted to an unfair representation of the in-state activity of the oil companies. In *Arco* we did not express any opinion on whether one of those distortions alone—valuation of property at cost—

---

**38.** There is disagreement in the recorded legislative history. See *Arco,* 705 P.2d at 427 (*compare* note 28 *with* the text accompanying note 27).

**39.** In the constitutional challenge presented by Arco, we rationalized the new scheme of taxation, *id.* at 427, but never attempted to identify the legislature's real motive—a task which more often than not would be impossible.

**40.** We then noted that "the Prudhoe Bay field is valued at about one percent of its actual worth." *Id.*

**41.** The official comment to § 11 of the UDITPA says: "This section is admittedly arbitrary.... The use of original cost ... has the advantage that the basic figure is readily ascertainable from the taxpayer's books. No method of valuing the property would probably be universally acceptable." UDITPA § 11, 7A U.L.A. 350 (1985). Section 11 of the UDITPA, dealing with valuation of property in the property component, remained precisely the same in art. IV, ¶ 11 of the Multistate Tax Compact, as enacted in AS 43.19.010, art. IV, ¶ 11.

would rise to the level of an unfair representation of income.[42]

Finally, while Gulf alleges that the property component causes an upward distortion of its in-state activity, we found in *Arco* that the payroll and sales components typically distort downward.[43] Our *Arco* opinion does not address the *net* distortion under these circumstances. For these reasons, the *Amoco* decision is still good law for the years in question.[44]

### 4. The alternatives

We do not doubt that productive oil wells lead to more business activity than dry wells do, even though both may be valued the same in the apportionment formula. However, it is difficult to create an alternative method of taxation that would work better than the apportionment formula in this case. To tinker with the numerator of the property component so that it reflects the market value of the Alaska leases would require a corresponding adjustment in the denominator. We would have to determine the market value of all Gulf's property worldwide (or at least all Gulf's oil leases)—a formidable task. Additionally, the payroll and sales components would have to be adjusted in accordance with our reasoning in *Arco*.

Alternatively, pursuant to the discretion clause, the apportionment formula could be abandoned and Gulf could be taxed by separate accounting. However, this would result in a tax near zero, since Gulf produced little or no oil here. Such a tax would fly in the face of our clear holding in *Amoco* that exploration, even when unsuccessful, is an important activity integral to the production of income. In short, it is proble-

matic, even in theory, to correctly apportion Gulf's Alaska income when its primary activity in this State was the ownership of dry leaseholds. Under these circumstances, we support the DOR's discretionary decision not to grant relief from the legislature's clear preference that property be valued at cost.

### C. *The constitutional dimension of valuing the non-productive leaseholds*

#### 1. Due process

As already noted, to establish the existence of a due process violation, Gulf must prove "by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportions to the business transacted ... in that State,' or has 'led to a grossly distorted result.' " *Container Corp.*, 463 U.S. at 170, 103 S.Ct. at 2942, 77 L.Ed.2d at 556 (citations omitted).

■■■ Gulf did not carry its burden. Admittedly, Gulf's taxable income would be considerably less if the leases were valued at zero rather than at cost. Gulf labels this difference a "distortion," and claims that the "distortion" ranges from 1,100% to 53,000%, depending on the year. However, showing a difference between Gulf's calculation and the DOR's calculation is a far cry from showing that there is a "grossly distorted result." The existence of a distortion depends on the validity of the underlying assumption in Gulf's brief that "Gulf really earned nothing in Alaska." That assumption relies on Gulf's separate geographic accounting. In this case, the basic weakness of separate accounting is highlighted: Gulf's calculation fails to account for hard-to-quantify contributions of

---

**42.** In fact, subsequent legislation leads us to believe the legislature did not regard distortions in the property component as the primary source of unfairness. The Oil Tax was repealed in 1981. Ch. 116, § 19, SLA 1981. The legislature enacted a new apportionment formula, AS 43.20.072; different from the formula still existing in AS 43.19.010 for non-oil producers. The legislature also explicitly reconfirmed its 1978 findings. Ch. 116, § 1(a), SLA 1981. Yet, the new apportionment formula, while eliminating the sales and payroll components, retained the property component.

**43.** *Arco,* 705 P.2d at 426. We suggested that the distortion in the sales component was "most important[ ]." *Id.*

**44.** However, we do not rule out the possibility that where an oil company had no business in Alaska other than the ownership of dry leases, and where the leases have no informational value to the company, then failure of the DOR to grant relief might be an abuse of discretion.

value resulting from activities such as the drilling of dry wells. Gulf did conduct business in Alaska: it explored for oil, entered into leases, drilled, and analyzed the results. Because those activities are integral to the production of income, a corresponding portion of Gulf's worldwide income can constitutionally be attributed to Alaska.

We do not intend to imply that cost valuation of property always leads to a fair and constitutionally permissible result. In this case, it might have been argued that the leaseholds should have been included in the property component, but at a value less than cost yet higher than zero. This would involve (1) proposing an alternate method of valuation; (2) justifying the method by showing that it leads to a result that is more accurate and fair than cost valuation; (3) using the superior method to value all property (or at least all oil leaseholds) in the property component; and (4) showing that the distortion is gross; that is, that the resultant tax under the DOR's approach is significantly higher than that under the superior method.[45]

Gulf did not do this. Gulf asserts that the leaseholds have no value. Yet the Gulf employee who testified that the leaseholds had no value contradicted himself immediately thereafter, testifying that they were to be used for research purposes so that "if and when additional leases would become available on the North Slope, then we would have an understanding of the permafrost problem, and thereafter not make the same mistake again.... It would certainly assist us in understanding the my-steries of the seismograph on the North Slope." We view that testimony as an admission that the leaseholds did have value.[46] Yet, Gulf produced no further evidence on exactly what that value was. Very simply, the constitutional challenge fails because Gulf did not meet its burden of proof.

### 2. Commerce Clause

The commerce clause "places restraints upon the taxing power of states similar to those of the due process clause. In fact, these two constitutional limits overlap to a great extent." *Arco*, 705 P.2d at 432 (quoting *Sjong v. State, Dep't of Revenue*, 622 P.2d 967, 973 (Alaska 1981), *appeal dismissed*, 454 U.S. 1131, 102 S.Ct. 986, 71 L.Ed.2d 284 (1982)). Generally, a state tax does not violate the commerce clause if it satisfies the due process requirements of nexus and fair apportionment, and if it "does not discriminate against interstate commerce and is fairly related to the services provided by the State." *Arco*, 705 P.2d at 432 (quoting *Complete Auto Transit v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326, 331 (1977)).

If a company that operated solely within Alaska had owned the dry leases and had little other business in Alaska, that company would have shown substantial losses and paid no taxes. Yet, under nearly the same circumstances, Gulf has been assessed a substantial deficiency. It might be said that valuing the leases at cost discriminates against interstate or foreign

---

**45.** *Cf. Norfolk & W. Ry. Co. v. Missouri Tax Comm'n*, 390 U.S. 317, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968). In that case, the Supreme Court analyzed a Missouri rule that the portion of a railroad company's nationwide rolling stock that could be attributed to that state, for property tax purposes, was determined by the proportion of the company's track that was located within Missouri. *Id.* at 321, 88 S.Ct. at 999, 19 L.Ed.2d at 1204. The tax commission found that about 8% of Norfolk & Western Railway Co.'s track was in Missouri. *Id.* at 321, 88 S.Ct. at 999, 19 L.Ed.2d at 1205. Based on this figure, it taxed 8% of the railway's rolling stock. *Id.* However, the railway was able to show that at any and all times, the actual value of rolling stock in Missouri was less than four-tenths of the figure arrived at by the commission. *Id.* at 322, 88 S.Ct. at 999, 19 L.Ed.2d at 1205. Based on the *evidence*, the Supreme Court found that the railway met its burden of showing a grossly distorted result. *Id.* at 326–28, 88 S.Ct. at 1001–02, 19 L.Ed.2d at 1208–09.

**46.** In addition to their value for research purposes, the properties may have played a role in attracting investment or obtaining credit, especially if they were listed on Gulf's financial statements at a value other than zero. The record does not disclose exactly when Gulf first reported on its financial statements its current belief that the properties were valueless.

commerce, since it adversely affects only those companies whose income is determined by apportionment—namely, multistate and multinational companies.

 We do not find this argument persuasive. The very existence of an apportionment scheme for multistate companies means that they are treated differently than local companies. But, it takes more than a difference to offend the commerce clause; it takes *discrimination*. Here, there is no discrimination. Admittedly, a multistate company that owns a dry leasehold may pay more tax than a local owner. But, a multistate company that owns a productive leasehold will pay less tax than the local company. This is not discrimination. Rather, it is a smoothing of the bumps that results from using the formula approach to taxation of multistate companies—taxation which, according to the Supreme Court, is akin to "slicing a shadow." *Container Corp.*, 463 U.S. at 192, 103 S.Ct. at 2954, 77 L.Ed.2d at 570.

For these reasons, we AFFIRM.