STATE of Alaska, DEPARTMENT
OF REVENUE, Appellant,

v.

OSG BULK SHIPS, INC., Appellee.

No. S–7498.

Supreme Court of Alaska.

Feb. 20, 1998.

Rehearing Denied Aug. 18, 1998.

Stephen C. Slotnick, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

Ann M. Bruner, Brian W. Durrell, Bogle & Gates, Anchorage, and D. Michael Young, Bogle & Gates, Bellevue, Washington, and Walter Hellerstein, University of Georgia, Atlanta, Georgia, for Appellee.

Susan A. Burke and Avrum M. Gross, Gross & Burke, Juneau, for Amicus Curiae Alaska Visitors Association.

Kenneth Klein, Cadwalader, Wickersham & Taft, Washington, D.C., and Ronald L. Baird, Anchorage, for Amicus Curiae North West CruiseShip Association.

Before RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

This appeal raises questions about the tax payable under the Alaska Net Income Tax Act, AS 43.20.011–43.20.350 (ANITA), for tax years 1981 through 1988 on income derived by the taxpayer from domestic and foreign shipping operations and investments. The State of Alaska, Department of Revenue (DOR) assessed additional income taxes against the taxpayer, OSG Bulk Ships, Inc. The superior court reversed DOR's decision and DOR now appeals. We now reverse in part and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

### A. Facts

OSG Bulk Ships, Inc. (OBS), a New York corporation, is a wholly-owned first-tier subsidiary of Overseas Shipholding Group, Inc. (OSG), a Delaware corporation. OBS and OSG both have their commercial domiciles in New York. OSG has more than a fifty percent ownership interest in over one hundred subsidiaries and partnerships, most of which are shipping companies. The shipping companies collectively own approximately sixty-five ocean-going vessels used in different types of trade throughout the world. OBS owns all of the domestic shipping companies; OSG International, Inc., which is also a first-tier subsidiary of OSG, owns most of the foreign shipping companies.

OSG, including its subsidiaries, is engaged in the ocean transportation of liquid and dry bulk cargoes in both the worldwide and U.S. domestic markets. It owns the largest independent fleet of unsubsidized U.S.-flag tankers, and is a major participant in the Alaskan oil trade. The rest of OSG's fleet is registered under foreign flags. OSG also owns several other companies, including holding companies, financial companies, service companies, and an insurance company.

OBS is the taxpayer. It owned corporations that in turn owned or chartered tanker vessels entering Alaska waters during audit years 1981 to 1988.[1] OBS and its domestic shipping companies reported their Alaska taxes on a unitary basis (as if they were a single taxpayer engaging in a single business). OBS did not include in the unitary group the foreign corporations related by ownership to OSG. Nor did OBS include the investment subsidiaries because OBS claimed they had no connection with Alaska and were not part of OBS's unitary business. OBS also claimed investment tax credits for new vessels.

### B. Proceedings

Following audits by DOR's Income and Excise Audit Division (Audit Division), DOR assessed OBS additional income taxes for tax years 1979 through 1983, 1985 through 1986, and 1988.

The Audit Division included approximately ninety foreign corporations in OBS's unitary group, determining that "OSG and all its more–than–50–percent–owned subsidiaries, including OBS, were engaged in a single, unitary business during the period under audit." This had the effect of including in the "worldwide unitary income" of OBS's corporate group the income of the foreign corpora-

---

1. These corporations were: Cambridge Tankers, Inc.; Juneau Tanker Corporation; San Diego Tankers, Inc.; San Jose Tankers, Inc.; Santa Barbara Tankers, Inc.; Santa Monica Tankers, Inc.; and Lake Michigan Bulk Carriers, Inc. DOR treated these corporations as one taxpayer for audit purposes, and referred to them as "OSG Bulk Ships, Inc." because that is how the taxpayer referred to itself in its consolidated Alaska Corporation Net Income Tax Returns. We follow the same convention here.

tions and all of the subsidiaries in which OSG had more than fifty percent ownership. The taxable corporate income attributable to the group's Alaska business was then calculated by multiplying the worldwide unitary income of the entire group by an "apportionment fraction" derived by dividing the value of the group's Alaska business activities by the value of its worldwide business activities. *See* AS 43.19.010 art. IV, ¶ 9. This adjustment increased OBS's income taxable in Alaska, and the Audit Division assessed additional taxes.[2]

OBS protested the assessments. Following administrative proceedings, DOR's hearing officer issued a recommended decision which DOR's Commissioner adopted. In pertinent part, the decision held that (1) income earned by OBS's foreign subsidiaries from operation of foreign flag vessels was not exempted by 26 U.S.C. § 883 and was therefore includable in OBS's apportionable income; (2) DOR did not exceed its statutory authority by promulgating 15 AAC 20.110(d), a regulation that reduced OBS's investment tax credit; and (3) OBS's investment income was properly treated as business income for Alaska tax purposes. As of July 1993 OBS's tax assessments totaled $789,495.

**2.** OBS states in its brief that while it does not agree with DOR's inclusion of approximately ninety foreign corporations in OBS's unitary group, it does not contest this issue on appeal.

**3.** The version of section 883 in effect after amendment in 1986 provided:

(a) **Income of foreign corporations from ships** and aircraft.—The following items shall not be included in gross income of a foreign corporation, and shall be exempt from taxation under this subtitle: [para.](1) **Ships operated by certain foreign corporations.**—Gross income derived by a corporation organized in a foreign country from the operation of a ship or ships if such foreign country grants an equivalent exemption to citizens of the United States and to corporations organized in the United States.

26 U.S.C. § 883(a)(1) (1988).

Prior to its amendment in 1986, subsection 883(a)(1) stated:

(a) **Income of foreign corporations from ships and aircraft.**—The following items shall not be included in gross income of a foreign corporation, and shall be exempt from taxation under this subtitle: [para.] (1) **Ships under foreign flag.**—Earnings derived from the oper-

OBS appealed to the superior court, which reversed each of these three rulings.

DOR now appeals the superior court's rulings on these three issues.

## III. *DISCUSSION*

### A. *Whether Internal Revenue Code Section 883 Exempts OBS's Foreign Shipping Income from Taxation by Alaska*

The Alaska Net Income Tax Act (ANITA), AS 43.20.011–43.20.350, taxes a corporation's "entire taxable income ... derived from sources within the state." AS 43.20.011(e). When OBS filed its 1981–88 Alaska tax returns, it excluded from its tax base all income derived from vessels owned by the foreign subsidiaries in its unitary group. In doing so, OBS reasoned that AS 43.20.021(a) had incorporated subsection 883(a)(1)[3] of the federal Internal Revenue Code (IRC), codified at 26 U.S.C. § 883(a)(1), into ANITA, and that section 883 exempted foreign shipping income.

Alaska Statute 43.20.021(a) incorporates sections of the IRC into the ANITA and the Multistate Tax Compact (MTC), AS 43.19.010–43.19.050,[4] unless the IRC provi-

ation of a ship or ships documented under the laws of a foreign country which grants an equivalent exemption to citizens of the United States and to corporations organized in the United States.

26 U.S.C. § 883(a)(1), amended by Pub.L. 99–514, § 1212(c)(3)-(5), 100 Stat. 2538 (Oct. 22, 1986).

The amendments to subsection 883(a)(1), effective for tax years after December 31, 1986, simply change the focus for the exemption from the country of the ship's documentation to the country of the corporation's organization. This change does not affect the section 883 analysis for OBS because all of OSG's foreign shipping subsidiaries that the auditor included as part of the unitary group both are organized under the laws of a foreign country that grants an equivalent exemption and own or operate ships documented under a country that grants an equivalent exemption.

**4.** The MTC is a restatement of the Uniform Division of Income for Tax Purposes Act (UDITPA), which was adopted in Alaska in 1959, but was then repealed in 1975. *See State, Dep't of Revenue v. Amoco Prod. Co.*, 676 P.2d 595, 598 & n. 3 (Alaska 1984).

sions are "excepted to or modified by" other ANITA provisions.[5] The sections adopted by reference encompass IRC section 883.

DOR disallowed the exemption, finding that OBS had not proven that its foreign shipping income was exempt from OBS's apportionable tax base. Reversing, the superior court held that AS 43.20.021(a) had incorporated subsection 883(a)(1) into Alaska law, thus exempting OBS's foreign shipping income.

 DOR contends on appeal that subsection 883(a)(1) is "excepted to or modified by" the ANITA, given differences in the methods employed by the State of Alaska and by the federal government for determining taxable income.[6] OBS argues that Alaska's income tax scheme is "entirely consistent" with the section 883 exemption.[7]

This is not the first time we have considered whether Internal Revenue Code provisions, ostensibly adopted by reference by AS 43.20.021(a), were "excepted to or modified by" other ANITA provisions. In *Gulf Oil Corp. v. State, Department of Revenue*, 755 P.2d 372, 380 (Alaska 1988), we held that a portion of the IRC dealing with the foreign tax credit was "excepted to or modified by" AS 43.20, which allowed neither a deduction nor a credit for foreign income taxes. In so holding, we noted that "[t]hat is not to say that Alaska law incorporates no Code provisions and no federal regulations having to do with the foreign tax credit. Future cases may reveal that it is desirable to conform our law to certain aspects of those federal provisions." *Id.* The source of the exception in *Gulf Oil* was the absence in AS 43.20 of any provision for a deduction similar to that provided by the IRC.

In this case, we must decide whether the tax scheme employed by the ANITA implicitly excepts to or modifies application of section 883. We first compare the different methodologies applied by the United States and the State of Alaska to determine taxable income.

When a state seeks to tax the income of a multinational business, it must determine the income properly allocable to in-state activities. *Id.* at 374. At all relevant times, Alaska has employed the worldwide formula apportionment method to calculate a multinational or interstate corporation's income earned in Alaska. AS 43.20.065; AS 43.19.010, art. IV, ¶ 9. Under that method, in-state income is determined by multiplying a corporation's worldwide income by an "apportionment fraction." AS 43.19.010, art. IV, ¶ 9.[8] A taxpayer's apportionment fraction is the numerical average of three factors—

5. AS 43.20.021(a) provides that "[s]ections 26 U.S.C. 1–1399 and 6001–7872 (Internal Revenue Code), as amended, are adopted by reference as a part of this chapter. These portions of the Internal Revenue Code have full force and effect under this chapter unless excepted to or modified by other provisions of this chapter."

6. We independently review the merits of an administrative decision. *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992). No deference is given to the superior court's decision when that court acts as an intermediate court of appeal. *Id.*

The interpretation of a tax statute is a question of law for which we have articulated two standards of review. We have distinguished between the rational basis test for questions of law involving agency expertise, and the substitution of judgment standard for questions of law that do not involve agency expertise. *Earth Resources Co. v. State, Dep't of Revenue*, 665 P.2d 960, 964–65 (Alaska 1983).

In this case, we must determine whether a particular IRC provision is excepted to or modified by the ANITA. This is a matter of pure statutory construction which is not within the particular expertise of the agency and which requires us to exercise our independent judgment. We have previously held that where the issues to be resolved " 'turn on statutory interpretation, the knowledge and expertise of the agency is not conclusive of the intent of the legislature in passing a statute.' " *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 904 (Alaska 1987) (citation omitted). We therefore substitute our judgment for that of DOR.

7. Two amici curiae, the Alaska Visitors Association (AVA) and North West Cruiseship Association (NWCA), filed briefs supporting OBS's position on this issue.

8. A corporation's "worldwide" income is all of its business income, whether it was earned inside or outside of Alaska; in essence, worldwide income is pre-tax income (determined without deducting income taxes assessed by other jurisdictions). AS 43.20.065; *see Gulf Oil Corp. v. State, Dep't of Revenue*, 755 P.2d 372, 375 (Alaska 1988).

its "property factor," its "payroll factor," and its "sales factor"—which compare its in-state business activities with its worldwide business activities.[9]

The United States does not utilize the "formula apportionment" method when it calculates the federal taxable income of multinational corporations. Instead, it uses "sourcing" provisions to allocate income to the United States or to other sources, depending upon where the income is earned. 26 U.S.C. §§ 861–65; *see also* 26 C.F.R. § 1.861–1 (1996). Income that cannot reasonably be "sourced" to the United States is deducted from the taxpayer's gross income and is not included when a taxpayer's U.S. income is calculated. *Id.*

There is consequently a fundamental difference in the way these governments calculate the taxable income of a multinational corporation. Alaska accomplishes its calculation by applying to all income an apportionment fraction that separates the local income from that earned elsewhere. The key to proper separation under this method is the apportionment fraction; it is in the calculation and application of this fraction that the separation is made. In comparison, the United States makes this separation when it first allocates income to sources inside and outside the United States.

OBS and DOR agree that Alaska's adoption of the worldwide apportionment method in AS 43.19 establishes an exception to IRC sections 861 through 865, which relate to the "sourcing" of income for tax purposes. They disagree, however, about whether IRC section 883, which is contained in the same IRC subchapter, is a "sourcing" provision. OBS claims and the superior court held that it is

not, because it grants an exemption, and consequently there is nothing in AS 43.20 that excepts to adopting IRC section 883 into Alaska's corporate tax scheme.

■ The ANITA does not expressly except to or modify the provisions of IRC section 883. Nonetheless, the scheme of allocation and apportionment provided in the MTC, AS 43.19, is fundamental to the ANITA in the context of taxation of taxpayers with foreign income. *See* AS 43.20.065.[10] Several circumstances convince us that, in the context of OBS's claim that its foreign shipping income should be exempted from taxation in Alaska, subsection 883(a)(1) is impliedly excepted to by the ANITA.

We first note that the MTC provides a comprehensive methodology for the allocation and apportionment required by the ANITA, AS 43.20.065. As seen above, the key to that methodology is the apportionment fraction. In our view, it is inconsistent with the MTC, and therefore the ANITA, to exempt an entire class of foreign-earned income from the taxpayer's worldwide income for purposes of attempting to distinguish between locally taxable and nontaxable income. Under the MTC, this separation is accomplished through the application of the apportionment fraction, not the calculation of worldwide income. The legislative history of section 883 demonstrates that it was enacted to eliminate the " 'double taxation' " of shipping income. *M/V Nonsuco, Inc. v. Commissioner of Internal Revenue*, 234 F.2d 583, 587 (4th Cir. 1956) (citing S.Rep. No. 275, 67th Cong., 1st Sess. (1921), 1939–1 (Part 2) C.B. 181, 191). The danger of multiple taxation in that context arises because multinational shipping activities subject the taxpayer to taxation by

9. These three factors are fractions; each is calculated by dividing the in-state amount of the taxpayer's subject business activity by the worldwide amount of the taxpayer's subject activity. AS 43.19.010, art. IV, ¶¶ 10, 13, 15. For example, the property factor is calculated by dividing the average value of the taxpayer's property owned or rented and used in Alaska during the tax period by the average value of all of its property owned or rented and used during that period. AS 43.19.010, art. IV, ¶ 10.

The formula apportionment method is based on the assumption that an effective way to fairly measure the locally taxable income of a multina-

tional business is to compare the value of its local and worldwide business activities and attribute income on the basis of that comparison. *Gulf Oil Corp.*, 755 P.2d at 374–75.

10. AS 43.20.065 provides:

A taxpayer who has income from business activity that is taxable both inside and outside the state or income from other sources both inside and outside the state shall allocate and apportion net income as provided in AS 43.19 (Multistate Tax Compact), or as provided by this chapter.

more than one nation. Avoidance of multiple taxation is the same purpose served by the MTC through the apportionment fraction.

DOR contends that allowing the section 883 exemption would have the effect of doubly protecting foreign shipping income. It reasons that because the denominator of a taxpayer's apportionment fraction is based on the value of all property, sales, and payroll, wherever and however derived, the inclusion of the values relating to foreign-flag vessels when calculating those factors under AS 43.19.010 art. IV, ¶¶ 9, 10, 13 & 15, reduces the apportionment factor. If section 883 also applied, thus reducing the taxpayer's worldwide income, it would cause a further reduction when the already-reduced apportionment fraction is multiplied by the newly reduced worldwide income. DOR concludes that this result would understate the taxpayer's Alaska taxable income. We agree that this would be the effect of granting the section 883 exemption.

It is also significant that the ANITA contains a statute that appears to deal specifically and comprehensively with the problem of multiple taxation of foreign or multistate water transportation carriers. *See* AS 43.20.071. That statute provides for apportionment of all business income of water transportation carriers in accordance with the MTC's apportionment formula methodology by modifying the property, payroll, and sales factors from which the apportionment fraction is calculated, by applying a "days-in-port" fraction.[11] This method further reduces the three statutory MTC factors, and thus the MTC's apportionment fraction. The result is a reduction in taxable income.

OBS argues that AS 43.20.071 is compatible with statutory exemptions like that pro-vided by section 883, because section .071 simply applies the apportionment method for water transportation carriers after their apportionable tax base is determined by eliminating exempt income. We reach a contrary conclusion. We think the reference in AS 43.20.071(a) to "all business income" of water transportation carriers is more consonant with finding the section 883 exemption inapplicable. Reading "all business income" at face value suggests that it encompasses all income of a business origin, without reduction for any class of income of foreign origin. Further, it appears that in the federal scheme, section 883 uses separate accounting methodology to avoid the problem of multiple international taxation of transportation carriers by assigning income to a source through reciprocal exemptions. The days-in-port ratio adopted by AS 43.20.071 avoids multiple taxation of transportation carriers by formula apportionment. As DOR argues in its reply brief, "Alaska has no need to incorporate a reciprocal exemption to avoid possible unfair double taxation of foreign or domestic vessels." More fundamentally, there is no reason to think that the legislature which adopted AS 43.20.071 to provide for sophisticated adjustments to the MTC apportionment fraction, specifically to prevent multiple taxation of water transportation carriers, contemplated that any other unspecified adjustments would be needed to avoid misallocation of this class of business income.[12]

OBS argues that the exemption provided by section 883 is not inconsistent with AS 43.20.011, which taxes "the entire taxable income of every corporation derived from sources within the State." It also argues that section 883 income can be earned either

11. AS 43.20.071 is entitled "Transportation carriers" and provides, in pertinent part,
(a) All business income of water transportation carriers shall be apportioned to this state in accordance with AS 43.19 (Multistate Tax Compact) as modified by the following:
. . . .
(4) the portions of the numerator of the property, payroll, and sales factors which are directly related to interstate mobile property operations are determined by a ratio which the number of days spent in ports inside the state bears to the total number of days spent in ports inside and outside the state; the term "days

spent in ports" does not include periods where ships are tied up because of strikes or withheld from Alaska service for repairs, or because of seasonal reduction of service; days in port are computed by dividing the total number of hours in all ports by 24.

12. We note that all of OBS's ships that called in Alaska were registered under the U.S. flag; therefore, none of the property, payroll, or sales of OBS's foreign flag ships was included in the numerator of the property/payroll/sales apportionment fraction.

within or outside Alaska waters, and that AS 43.20.011, which geographically limits taxation to income derived from "sources within the State," operates alongside and independently of section 883. It similarly interprets AS 43.20.065 to provide for apportionment of income after reductions for applicable exemptions. OBS also argues that section 883 is not inherently incompatible with the general apportionment provisions of the MTC, and notes that DOR does not object to applying other exemptions, such as IRC section 103, which exempts interest.

DOR responds that provisions such as section 103 do not have the effect of assigning income to a foreign or domestic source, unlike section 883. We agree with that distinction.

■ We conclude that the arguments for finding that AS 43.20 impliedly excepts to section 883 are stronger than those to the contrary.[13] If we were to accept OBS's position, it would inevitably result in understating OBS's Alaska taxable income in a way not intended by the Alaska legislature.

**B.** *Whether DOR Exceeded Its Statutory Authority by Adopting 15 AAC 20.110(d)*

DOR next argues that the superior court erred in holding that DOR exceeded its authority by promulgating a regulation limiting the statutory investment tax credit.[14]

The legislature enacted the investment tax credit as part of the ANITA by adopting 26 U.S.C. § 38 by reference. AS 43.20.021(a). Section 38 provided an investment tax credit for taxpayers who invested in tangible personal property used in a trade or business.[15]

The legislature adopted several statutory limitations on the credit. It limited the credit for corporations to eighteen percent of the federal credit which was "attributable to Alaska." AS 43.20.021(d).[16] It also limited the credit to the amount of federal credit on "the first $20,000,000 of qualified investment ... put into use in the state for each taxable year." AS 43.20.036(b).[17]

DOR promulgated an investment tax credit regulation, 15 AAC·20.110, and in doing so

---

**13.** In so holding, we reject arguments, advanced by OBS and AVA, that legislative events in 1991 and 1992 establish that the legislature did not intend to except to section 883. In 1991 and 1992, the Alaska legislature proposed, but ultimately rejected, amendments that would have expressly excepted to incorporation of section 883. OBS and AVA rely on comments at committee and subcommittee hearings regarding the proposed legislation in support of their position that the legislature realized section 883 had already been incorporated into Alaska law. Such comments, provided in context of legislation which was not adopted, offer no insight into the thinking of the legislature when it enacted AS 43.20.021 in 1975. *See Hillman v. Nationwide Mut. Fire Ins. Co.,* 758 P.2d 1248, 1252 (Alaska 1988) ("While the legislature is fully empowered to declare present law by legislation, it is not institutionally competent to issue opinions as to what a statute passed by an earlier legislature meant."). *See also Wright v. West,* 505 U.S. 277, 295 n. 9, 112 S.Ct. 2482, 2491 n. 9, 120 L.Ed.2d 225 (1992); William N. Eskridge, Jr., *The New Textualism, in* 2A Norman J. Singer, *Sutherland Statutory Construction* 568, 578 (5th ed.1992) (noting the U.S. Supreme Court's "occasional willingness to consider 'subsequent legislative history,'" but also noting that the Court has "often iterated that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one'").

Our holding on the exemption issue makes it unnecessary for us to consider DOR's alternative argument that incorporating section 883 into Alaska law would discriminate against interstate commerce.

**14.** DOR claims that the regulation's "first use" requirement is not at issue here because OBS was not denied a credit on this basis. It appears, however, that DOR applied this limitation in disallowing the credit for OBS ships that did not visit an Alaska port on their initial voyages.

**15.** Because the Tax Reform Act of 1986, P.L. 99–514, generally repealed the credit for property placed in service after December 31, 1985, the credit is not applicable to all tax years that are the subject of this appeal.

**16.** AS 43.20.021(d) states, "[w]here a credit allowed under the Internal Revenue Code is also allowed in computing Alaska income tax, it is limited to 18 percent for corporations of the amount of credit determined for federal income tax purposes which is attributable to Alaska."

**17.** AS 43.20.036(b) states, "[f]or purposes of calculating the income tax payable under this chapter, the taxpayer may apply as a credit against tax liability the investment tax credit allowed as to *federal taxes under 26 U.S.C. 38 (Internal Revenue Code) upon only the first $20,000,000 of qualified investment ... put into use in the state for each taxable year."

cited as authority AS 43.05.050, AS 43.20.021, and AS 43.20.036. Subsection (d) of that regulation treated transportation equipment "first used" in Alaska as "new property."[18] It also prorated qualified expenditures by comparing the number of days the property was used in Alaska and the number of days it was used elsewhere.

OBS claimed investment tax credits, calculated as eighteen percent of the first $20 million of qualified investments put into use for each taxable year, and prorated under 15 AAC 20.110(d) by comparing days of in-state and out-of-state use. The auditor disallowed any credit for vessels that had not visited Alaskan ports on their initial voyages, per 15 AAC 20.110(d). On appeal by OBS, the superior court held that DOR had exceeded its authority by promulgating a regulation containing first use and pro rata apportionment limitations in addition to the limitations imposed by AS 43.20.021(d) and AS 43.20.036(b).

■ When reviewing the validity of an agency's regulations, we initially determine whether the agency had the authority to adopt such regulations. This determination is a question of law to which we apply our independent judgment. *See Warner v. State, Real Estate Comm'n,* 819 P.2d 28, 31 (Alaska 1991).

To be within the agency's grant of rule-making authority, a regulation must be "consistent with and reasonably necessary to carry out the purposes of the statutory provisions conferring rule-making authority on the agency." *State, Dep't of Revenue v. Cosio,* 858 P.2d 621, 624 (Alaska 1993) (citations omitted). This test ensures that in promulgating the regulations the agency did not exceed the power delegated to it by the legislature. *Id.* We next determine "whether the regulation is reasonable and not arbitrary." *Id.*

■ "We accord an administrative regulation a presumption of validity; the party challenging the regulation bears the burden of demonstrating its invalidity." *Anchorage Sch. Dist. v. Hale,* 857 P.2d 1186, 1188 (Alaska 1993) (citations omitted). Further, we will not "substitute our judgment for that of the agency with respect to the efficacy of a regulation nor review the 'wisdom' of a particular regulation." *Id.* (citation omitted). However, we will apply the substitution of judgment standard of review when reviewing the validity of an administrative regulation because this is a question of statutory interpretation. *Id.* at 1188 n. 3.

■ Whether 15 AAC 20.110(d) is valid depends here on whether it is consistent with the tax credit statutes and reasonably necessary for their enforcement. *See* AS 43.05.080; AS 44.62.030.[19] *See also Cosio,* 858 P.2d at 624.

Citing the plain language of AS 43.20.036(b), its legislative history, and canons of statutory construction, DOR contends that 15 AAC 20.110(d) is consistent and necessary because the regulation simply clarifies when a credit is allowed for transportation property not used exclusively in the state.

OBS argues that 15 AAC 20.110(d) is unnecessary and inconsistent with the statutes providing for the credit. It asserts that the regulation's pro rata apportionment requirement results in a double reduction of the

---

**18.** 15 AAC 20.110(d) states:

> For purposes of this section, "placed in service in the state" means that the first use of the qualified investment is in this state. If the property is used elsewhere in the taxable year of acquisition and brought to this state during that same year, that property *is considered* used property and is subject to the limitations as provided in the Internal Revenue Code. If the property is to be used elsewhere during the taxable year of acquisition and brought to this state in another taxable year, the property does not qualify for the investment credit. Transportation equipment used within and outside of this state whose use commences in this state

> is considered new property. The qualified expenditure for interstate transportation equipment must be based on a prorated formula of days used in this state compared to days used elsewhere.

**19.** Even though AS 43.05.080 grants DOR authority to adopt regulations, it limits that authority to regulations "necessary for the enforcement of the tax ... laws administered by it." Likewise, if a department has authority to adopt regulations, a regulation is not valid "unless consistent with the statute and reasonably necessary" to carry out the statutory purposes. AS 44.62.030.

credit, because the statutes already limit the credit to property used in Alaska. Implicit in OBS's argument is the assertion that a taxpayer is entitled to the full credit regardless of the amount of time the property is used in Alaska.

### a. *Legislative history*

Before it was amended in 1981, AS 43.20.036(b) provided a credit for any "section 38" property, and did not limit the credit to property put into use in Alaska. The 1981 amendments were introduced in Senate Bill 524, and added the requirement that the equipment or property be put into use "in the state." Senate Bill (S.B.) 524, 12th Leg., 1st Sess. (1981). The House Finance Committee also adopted a letter of intent which stated that "HCSSB 524(Fin) provides an increase in the investment tax credit allowed for in-state investments for corporations doing business in Alaska." 1981 House Journal 2009 (June 8, 1981). Thus, the legislature intended to encourage commercial investments in Alaska in order to benefit Alaska's economy.

### b. *Statutory construction*

The tax credit statutes have two features salient here.[20] Alaska Statute 43.20.021(d), a subsection of the statute that adopted the IRC section 38 investment tax credit by reference, limits the state credit to a percentage of the federal credit "which is attributable to Alaska." Alaska Statute 43.20.036(b) limits the credit to a qualified investment "put into use in the state for each taxable year."

The latter statute can reasonably be read to require that the equipment first be used in Alaska as a qualification for the credit. Both statutes can reasonably be read to require a determination of the extent to which the credit "is attributable to Alaska" or the investment is "put into use" in Alaska. Such a determination necessarily involves distinguishing use in Alaska from use elsewhere. Absent such a determination, a taxpayer would be entitled to a full tax credit in Alaska even though the property received little use in Alaska.

From the legislative history and the statutory language "put into use in the state," it is clear that the legislature intended the credit to apply to property put into use within the state during the taxable year. The amendment was adopted in order to benefit Alaska's economy by encouraging investment in the state. Thus, DOR's interpretation of the language "put into use in the state" as "first use" clarifies an ambiguity left by the statutory language—the meaning of "put into use in the state"—in a manner consistent with legislative intent. The "first use" requirement guarantees that the equipment or property is not used up outside the state, and is not brought just momentarily to the state at the end of the taxable year.[21] DOR has interpreted the first use requirement for transportation equipment to mean an initial voyage in which Alaska was a port of call.

DOR's adoption of the pro rata apportionment formula for transportation equipment and property is also consistent with the statutory purpose. Without such a requirement, owners of interstate transportation equipment could receive a full tax credit from every state in which their property was used in a given year. The limited tax credit based upon days in port also fairly determines the "contribution" the taxpayer is making to Alaska without giving credit for investment outside of the state.

■ We find that 15 AAC 20.110(d) is consistent with and reasonably necessary to implement the provisions of AS 43.20.021(d)

---

20. "Statutory construction begins with an analysis of the language of the statute construed in view of its purpose." *Borg–Warner Corp. v. Avco Corp.*, 850 P.2d 628, 633 n. 12 (Alaska 1993) (citation omitted). "The plainer the language of the statute, the more convincing any contrary evidence must be." *Id.*

21. Furthermore, while DOR could have employed a test other than first use to effectuate

legislative intent, this court will not "substitute [its] judgment for that of the agency with respect to the efficacy of a regulation nor review the 'wisdom' of a particular regulation." *Anchorage Sch. Dist. v. Hale*, 857 P.2d 1186, 1188 (Alaska 1993) (citation omitted); *see also State, Dep't of Revenue v. Cosio*, 858 P.2d 621, 624 (Alaska 1993).

and AS 43.20.036(b).[22] Our conclusion is also consistent with the following canon of construction: Exemptions are narrowly construed against the taxpayer. *State, Dep't of Revenue v. Alaska Pulp Am., Inc.*, 674 P.2d 268, 276 (Alaska 1983). In effect, DOR's regulation interpreted the tax credit statutes. DOR did not exceed its authority in doing so. We conclude that the superior court erred in holding to the contrary.

### C. *Whether OBS's Apportionable Income Should Include the Income of the Related Investment Companies*

The DOR hearing officer concluded that OBS had not proven that investment income (consisting of interest, dividends, and capital gains) earned by corporations within OBS's unitary group was not operational business income. The hearing officer therefore included that income in OBS's apportionable tax base. The superior court reversed, holding that the investment income was not "business income" because it was not used as operating capital in OBS's shipping business and because it was earned through investment activities unrelated to Alaska. DOR argues on appeal that the investment income should be included in OBS's apportionable tax base.[23]

▇▇▇ Two tests govern our resolution of this issue: (1) the statutory test set out in the Alaska tax statutes to determine if the investment income was "business" income, and (2) the constitutional test adopted by the United States Supreme Court in *Allied–Signal, Inc. v. Director, Division of Taxation*, 504 U.S. 768, 787–88, 112 S.Ct. 2251, 2263, 119 L.Ed.2d 533 (1992), to determine if the income was used for an investment or an operational purpose.[24]

OBS states that the only investment income at issue is that of its related investment companies which the auditor included in OBS's unitary group.[25] DOR contends that at the hearing before DOR, OBS argued that none of its investment income was apportionable. Neither the DOR hearing officer nor OBS segregated the investment income of the shipping companies from the investment income of the investment companies within OBS's unitary group.

### 1. *The statutory standard: business vs. nonbusiness income*

Taxing a corporation's "entire taxable income ... derived from sources within the

---

**22.** OBS tersely asserts in a footnote in its brief that the regulation is potentially unconstitutional, on the theory that it burdens interstate transportation property. It also asserts that the statutes should be interpreted to avoid unconstitutionality. Although this cursory treatment does not justify our substantive consideration of the issue, it appears to us that the regulation and the statutory scheme are internally consistent, and would not result in taxation of more than all of a unitary business's income if every taxing jurisdiction adopted identical provisions. *See Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). In that case, the Court defined "internal consistency," stating, "[t]he first, and again obvious, component of fairness in an apportionment formula is what might be called internal consistency—that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business income being taxed." *Id.* at 169, 103 S.Ct. at 2942; *see also Trinova Corp. v. Michigan Dep't of Treasury*, 498 U.S. 358, 380, 111 S.Ct. 818, 832, 112 L.Ed.2d 884 (1991).

**23.** The only investment income in dispute is that of the investment companies. The taxpayer confirms in its brief that it does not assert on appeal

that any part of its own investment income is not apportionable income.

**24.** Whether DOR properly characterized particular investment income of OBS's investment companies as "business" or operational income subject to apportionment presents a mixed question of law and fact. The legal question raises issues of constitutional and statutory interpretation which we review with our independent judgment. *See Allied–Signal v. Director, Div. of Taxation*, 504 U.S. 768, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992); *Earth Resources Co. v. State, Dep't of Revenue*, 665 P.2d 960, 965 n. 8 (Alaska 1983). We will uphold an agency's findings of fact if they are supported by substantial evidence. *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

**25.** OBS concedes that its shipping companies had certain "short term" investments that produced operating capital and long term investments of non-operating capital. The auditor also included the income from those investments as business income. OBS does not argue in this appeal that it was error to do so.

state," *see* AS 43.20.011(e), in part requires allocation and apportionment of income to in-state and out-of-state sources in accordance with AS 43.19, the Multistate Tax Compact (MTC). *See* AS 43.20.065 ("A taxpayer who has income from business activity that is taxable both inside and outside the state or income from other sources both inside and outside the state shall allocate and apportion net income as provided in AS 43.19 (Multi-state Tax Compact), or as provided by this chapter."). The MTC classifies corporate income from intangible property into two categories, "business income" and "nonbusiness income." AS 43.19.010, art. IV, ¶ 1(a), (e). The MTC states that "business income" includes:

> [I]ncome arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

AS 43.19.010, art. IV, ¶ 1(a). A taxpayer's taxable Alaska income is its business income as apportioned according to the three-factor formula apportionment method. AS 43.19.010, art. IV, ¶ 9.[26]

"Nonbusiness income" encompasses "all income other than business income." AS 43.19.010, art. IV, ¶ 1(e). Under the MTC, nonbusiness income from capital gains from the sale of intangible property, interest, and dividends must be allocated to the taxpayer's commercial domicile; thus, if the taxpayer's commercial domicile is outside Alaska, the taxpayer's apportionable Alaska tax base does not include income generated from these sources. AS 43.19.010, art. IV, ¶¶ 4, 6(c), 7. The taxpayer's commercial domicile is "the principal place from which the trade or business of the taxpayer is directed or managed." AS 43.19.010, art. IV, ¶ 1(b). If the income from dividends, interest, or capital gains from intangibles is "business income" as it is defined above, it is properly included in the taxpayer's apportionable tax base.

Thus, whether ANITA taxes a corporation's out-of-state income depends in part on whether it is "business income" under the MTC.

We must determine whether the hearing officer correctly applied Alaska's statutory tax standards to OBS's investment income. The Oregon Supreme Court in *Sperry & Hutchinson Co. v. Department of Revenue*, 270 Or. 329, 527 P.2d 729 (1974), was the first state supreme court to determine whether a corporation's interest income from investments constituted business income under UDITPA. *See* 1 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* § 9.10[1][a], at 9–48 (2d ed.1993). The court there concluded that earnings from short-term securities held to satisfy the corporation's needs for liquid capital in its Oregon operations constituted business income, but that earnings from short-term securities held pending acquisition of other companies or favorable developments in the long-term money market, and long-term securities held for investment purposes, were non-business income. *Id.*, 527 P.2d at 730–31. *See also Lone Star Steel Co. v. Dolan*, 668 P.2d 916 (Colo.1983) (following *Sperry & Hutchinson* and holding that under UDITPA, interest income on short-term loans made by Lone Star to its parent company from surplus funds not immediately needed for Lone Star's operations was business income); *Cincinnati New Orleans and Tex. Pac. Ry. v. Kentucky Dep't of Revenue*, 684 S.W.2d 303 (Ky.App.1984) (holding interest income earned by railroad company from short-term securities purchased with surplus cash from its railroad operations was business income).

In the instant case, although the disputed income was generated from investments and New York is the domicile of OBS and the related investment corporations, the hearing officer found the disputed income was business income on the theory that the acquisition, management, and disposition of this intangible property (dividends, interest, and capital gains) constituted integral parts of the taxpayer's regular trade or business op-

---

**26.** AS 43.19.010, art. IV, ¶ 9 states, "All business income shall be apportioned to this state by multiplying the income by a fraction, the numer-ator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three."

erations. The payors of this income were not members of OBS's unitary group, but were generally major, publicly-owned business entities, including AT & T, Bankamerica Corporation, Northwest Bancorp, Sears, Roebuck & Co., and Citicorp. The hearing officer reached her conclusion by examining OSG's annual reports to its stockholders; the affidavits of Alan Carus,[27] OSG's controller; and the minutes from OSG's board meetings.

According to Carus, earnings totaling over $200 million were the primary source of investment funds OSG accumulated before it commenced its Alaska shipping activities. Proceeds, totaling about $17 million, from public stock offerings in 1970 and 1972 were another source. Carus also affied that the investments are not operationally related to OBS's Alaska shipping business, and that "shipping income of the shipping subsidiaries, rather than investment income, was generally used to cover the costs of operation of the shipping operations." Carus stated that OBS intended to make these investments for investment purposes only, and that the income generated did not serve an operational function. Carus conceded that because "dollars are fungible," it was impossible to say that no investment income strayed into use for OBS's operating costs; however, he also stated that it was highly unlikely that any significant amount of the investment income was invested in the companies' vessels that called in Alaska. He also affied that the "overwhelming majority" of the investment income was reinvested, and that the cost basis of the investment assets grew from $97 million at the beginning of the audit periods to $261 million at the end of the audit periods. "The shipping subsidiaries that called in Alaska were self-sufficient, i.e., they generated sufficient revenues from their own operations to cover their expenses." He also affied that "[n]one of the stocks, bonds, or other investment assets was used as collateral for any debt of the shipping subsidiaries."

 In determining that OBS's investment income was "business income" under AS 43.19.010, art. IV, ¶ 1(a), the hearing officer found that "concrete evidence" did not support Carus's statements that the investments were made for an investment function and that the shipping companies covered their operating costs with operating revenue (rather than investment income).[28] The hearing officer focused upon Carus's fungibility admission. Based in part upon that admission, the hearing officer concluded that OBS had not carried its burden of showing that its investment income constituted nonbusiness income.

The Audit Division also relied on OSG's 1996 annual shareholders report. That report stated that OSG's "strong and highly liquid financial condition provides a sound foundation for future progress.... [OSG's] significant cash flow has enabled [it] to reduce its long term debt to equity ratio to its lowest level ... and to continue to upgrade its fleet and to pursue opportunities as they arise." From this, the hearing officer concluded that "[i]t is clear that building its financial strength was a key component of [OBS's] overall strategy to be in a position to pursue opportunities for expansion when they arose." The hearing officer therefore concluded that the "acquisition, management and disposition of [OBS's] investments was an integral part of [OBS's] business" since the investment decisions were "obviously aimed at building its financial strength overall."

 In our view it is unwise to construe the two MTC categories, "business income" and "nonbusiness income," without reference to the constitutional standard which has been established by decisions of the United States

---

27. DOR asserts that Alan Carus's supplemental affidavit submitted to the DOR hearing officer was untimely and was filed "over the objection of the division." However, as OBS correctly notes, OBS requested permission to supplement the record and to file a post-hearing brief after the Supreme Court decided *Allied–Signal*, 504 U.S. 768, 112 S.Ct. 2251, and the hearing officer granted that request. DOR initially objected to this request, but later retracted its objection and chose not to file a responsive brief. Thus, DOR did not preserve its contention that Carus's supplemental affidavit was untimely.

28. The weight given to statements made in an affidavit is determined by the trier of fact. *See Gregor v. City of Fairbanks*, 599 P.2d 743, 746 n. 10 (Alaska 1979).

Supreme Court. The compatibility of these standards has been suggested by the Court in *Allied–Signal*. To avoid confusion and needless separate discussion of the MTC and constitutional standards, we will consider that one requirement for finding that income is "business income" under the MTC is that it is income which is taxable under the constitutional standard. We now discuss that standard.

### 2. *The constitutional standard: investment income versus operational income*

■ "The principle that a State may not tax value earned outside its borders rests on the fundamental requirement of both the Due Process and Commerce Clauses" of the U.S. Constitution that " 'some definite link, some minimum connection' " must exist " 'between a state and the person, property or transaction it seeks to tax.' " *Allied–Signal*, 504 U.S. at 777, 112 S.Ct. at 2258 (quoting *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 344–45, 74 S.Ct. 535, 539, 98 L.Ed. 744 (1954)). The Commerce Clause imposes this limitation because corporations would be subjected to severe multiple taxation which would negatively affect the national economy if each state were permitted to tax values earned outside its borders. *Allied–Signal*, 504 U.S. at 777–78, 112 S.Ct. at 2258.

■ The "minimum connection" requirement of the Due Process Clause requires that when a state seeks to tax income earned by a multistate or multinational corporation from a particular activity, there must be a connection between the state and the activity, rather than a connection only to the actor whom the state seeks to tax. *Id.* at 778, 112 S.Ct. at 2258. The Supreme Court has held that when a nondomiciliary corporation doing some business within the state receives dividends from a subsidiary having no other connection with the state, the state may not constitutionally tax the dividend income unless the recipient taxpayer corporation and

its underlying subsidiary payor were engaged in a unitary business. *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982).

In *Allied–Signal* the Supreme Court reaffirmed the unitary business principle as the linchpin for determining whether a state may constitutionally tax the dividend income of a nondomiciliary corporation.[29] The Court went on to hold, however, that a unitary relationship between the payor of the intangible income (there, a corporate dividend) and the payee is not invariably a necessary prerequisite for apportionment of income to a nondomiciliary state. 504 U.S. at 787, 112 S.Ct. at 2263. The test is whether the "capital transaction serve[s] an operational rather than an investment function." *Id.* As an example of an "operational" function, the Supreme Court cited short-term investments that provide working capital for a corporation, such as "the interest earned on short-term deposits in a bank located in another state if that income forms part of the working capital of the corporation's unitary business." *Id.* at 787, 112 S.Ct. at 2263.

> The hallmarks of an acquisition that is part of the taxpayer's unitary business continue to be functional integration, centralization of management, and economies of scale. *Container Corp.* clarified that these essentials could respectively be shown by: transactions not undertaken at arm's length; a management role by the parent that is grounded in its own operational expertise and operational strategy; and the fact that the corporations are engaged in the same line of business.

*Allied-Signal*, 504 U.S. at 789, 112 S.Ct. at 2264 (citing *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 178, 180, 103 S.Ct. 2933, 2947, 2948, 77 L.Ed.2d 545 (1983)) (citations omitted).

■ The taxpayer must prove by "clear and cogent evidence" that the state is seeking to tax extraterritorial values. *See Con-*

---

**29.** The U.S. Supreme Court in *Allied–Signal* rejected New Jersey's request to adopt the UDITPA definition of business income as the constitutional test. 504 U.S. at 786–87, 112 S.Ct. at 2262–63. The Court also made it clear that if stock on whose sale a taxpayer realizes a capital gain served only an "investment" function and not an "operational" function, the gain is not subject to apportionment for purposes of that state's corporate tax, even though it may constitute "business income" under the UDITPA. *Id.* at 787–88, 112 S.Ct. at 2263.

*tainer Corp. of Am.*, 463 U.S. at 175, 103 S.Ct. at 2945. In *Container Corp.* the Supreme Court noted that " '[t]his burden is never met merely by showing a fair difference of opinion which as an original matter might be decided differently. . . . [W]e will [not] re-examine, as a court of first instance, findings of fact supported by substantial evidence.' " *Id.* at 176, 103 S.Ct. at 2945–46 (quoting *Norton Co. v. Department of Revenue*, 340 U.S. 534, 537–38, 71 S.Ct. 377, 380, 95 L.Ed. 517 (1951)). *See also Allied–Signal*, 504 U.S. at 794, 112 S.Ct. at 2266 (O'Connor, J., dissenting) (citing *Container Corp.* and asserting that the taxpayer had not met its "heavy burden" of proving by clear and cogent evidence that its capital gains were not operationally related to its in-state business).

The Court held in *Allied–Signal* that the "mere fact that an intangible asset was acquired pursuant to a long-term corporate strategy of acquisitions and dispositions does not convert an otherwise passive investment into an integral operational one." *Id.* at 788, 112 S.Ct. at 2263–64.

Applying *Allied–Signal* to the OBS evidence in context of the statutory business/nonbusiness income distinction, the hearing officer concluded that the income generated by OBS's related investment companies was operational and properly includable in OBS's apportionable tax base.[30]

The DOR hearing officer also rejected assertions found in the supplemental Carus affidavit that the purpose of making the investments was for an investment function and not an operational function. The hearing officer stated that OBS's claims were not "supported by any concrete evidence." The hearing officer found that given the fungibility of dollars, "investment" monies may have been used to fund the shipping companies

within the unitary group, and that OBS had failed to meet its burden of showing that its income from investments clearly constitutes investment income.

OBS contends that the facts relied upon by the hearing officer do not satisfy *Allied–Signal*'s "operational" income test. It argues that evidence of commingling some investment income with income used for shipping operations is insufficient to show that the investment income is "operational."

Although *Allied–Signal* provides examples of the types of income that can properly be characterized as "operational income," the Court there noted that determining whether income serves an operational or investment function is fact intensive. *Id.* at 785, 112 S.Ct. at 2262. In the case at bar, any commingling by OBS of investment income of its nondomiciliary investment companies with income used for the operational expenses of the shipping companies with vessels that called in Alaska appears to have been *de minimis. See generally F.W. Woolworth Co. v. Taxation and Revenue Dep't*, 458 U.S. 354, 363–64 & n. 11, 102 S.Ct. 3128, 3135 & n. 11, 73 L.Ed.2d 819 (1982) ("All dividend income—irrespective of whether it is generated by a 'discrete business enterprise'—would become part of a unitary business if the test were whether the corporation commingled dividends from other corporations . . . ." (citation omitted) (emphasis omitted)).

The Court held in *Allied–Signal* that out-of-state investment income may be taxed only when the investment amounts to the acquisition of capital for the corporation's unitary business, or when the investment is so short-term that it amounts to a bank account for the unitary business. 504 U.S. at 789–90, 112 S.Ct. at 2264. The hallmarks of an investment that becomes part of the unitary business are "functional integration,

---

**30.** The hearing officer stated:

[OBS's] annual reports are replete with exaltations regarding its strong and highly liquid financial condition. It is clear that building its financial strength was a key component of its overall strategy to be in a position to pursue opportunities for expansion when they arose. Its substantial financial resources, including its investment income, allowed it to secure long-term borrowing and to incur capital lease obli-

gations to finance vessel additions, thereby strengthening its competitive position in both domestic and worldwide bulk shipping markets.

Under these circumstances, it would be difficult to conclude that the investment transactions at issue did not serve an operational function, as required under *Allied–Signal*. (Citation omitted.)

centralization of management, and economies of scale." *Id.* at 789, 112 S.Ct. at 2264. The Court there concluded that the petitioner corporation's investment in the stock of a second corporation did not qualify as operational because the two corporations' activities were unrelated, and the first corporation did not even acquire a controlling stake in the second corporation. *Id.* at 788, 112 S.Ct. at 2263. The Court was careful to reiterate that how the investment *income* is used is irrelevant; it noted that even if those proceeds are used to acquire capital that becomes part of the unitary business, out-of-state investment income cannot be taxed unless the *investment itself* "was run as part of [the] unitary business." *Id.* at 789, 112 S.Ct. at 2264.

Income from investments that are not part of the unitary business may still be taxed if the income accrues from "short term deposits in a bank" and "that income forms part of the working capital of the corporation's unitary business." *Id.* at 787, 112 S.Ct. at 2263. The Court found in *Allied–Signal* that stock held "for over two years" could not amount to "a short term investment of working capital analogous to a bank account." *Id.* at 790, 112 S.Ct. at 2264.

 The hearing officer concluded that OBS's "investment decisions were obviously aimed at building its financial strength overall." In our view, the hearing officer's definition of "operational income" would swallow the distinction between operational and investment income. *See Allied–Signal,* 504 U.S. at 784–85, 112 S.Ct. at 2261–62 (rejecting New Jersey's argument that since "multistate corporations ... regard all of their holdings as pools of assets, used for maximum long-term profitability, ... any distinction between operational and investment assets is artificial"). Further, Carus explicitly affied that none of the investment assets was used as collateral for any debt of the shipping subsidiaries. Because the hearing officer applied a standard that the Supreme Court rejected in *Allied–Signal,* and because we cannot say as a matter of law that OBS met its burden of proving that the investment income was not operational, we reverse the determination made by the DOR hearing

officer. We remand so that OBS's investment income may be segregated as between investment or operational functions. On remand, the corporation's out-of-state investment income may be apportioned for state taxation only if either (1) the investment itself constitutes part of the corporation's unitary business (where unitariness is indicated by functional integration, centralization of management, and economies of scale), or (2) the investment is short term and the income is used to fund the unitary business, such that the investment is analogous to a bank account for the unitary business.

## IV. *CONCLUSION*

For these reasons, we REVERSE the superior court judgment to the extent it is based on that court's holdings that the section 883 exemption applies to OBS here and that DOR exceeded its statutory authority when it promulgated 15 AAC 20.110(d). We REVERSE the superior court's holding that OBS's investment income was nonbusiness income, and we REVERSE and REMAND for a redetermination by the DOR hearing officer whether OBS's income is operational or investment income pursuant to the constitutional test announced in *Allied–Signal.*

COMPTON, C.J., not participating.